SOPHIE STARNAWSKI, Plaintiff-Appellant, *v.* LICENSE APPEAL COMMISSION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 80-2685

Opinion filed November 17, 1981.

Aldus S. Mitchell and Stephen Stern, both of Mitchell & Black, P. C., of Chicago (Richard N. Kaplan, of Rosenfield, Kaplan & Halperin, of counsel), for appellant.

Stanley Garber, Corporation Counsel, of Chicago (Robert Retke and Frank W. Nagorka, Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE PERLIN delivered the opinion of the court:

The plaintiff, Sophie Starnawski, appeals from a judgment of the circuit court of Cook County entered in an action under the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*). The circuit court judgment affirmed a decision of the License Appeal Commission of the City of Chicago, which sustained the revocation of Starnawski's liquor license by Mayor Jane Byrne, the local liquor control commissioner of the City of Chicago.

The following issues are presented for review: (1) whether refusal to provide a licensee a copy of the administrative hearing officer's report to the local liquor control commissioner is a denial of due process of law; (2) whether sections 5 and 8 of article VII of the Dramshop Act (Ill. Rev. Stat. 1979, ch. 43, pars. 149 and 153), which provide for different procedures for reviewing revocation orders based on the population of the community in which the licensed premises is located, create an unconstitutional classification; (3) whether the conversation between Officer Lamb, the City of Chicago's sole witness, and Judy Martin, an alleged prostitute, was properly admitted into evidence at the license revocation hearing; and (4)· whether the decision of the local liquor control commissioner is supported by the manifest weight of the evidence.

For the reasons which follow, we affirm the judgment of the circuit court.

Sophie Starnawski was the holder of a local retail liquor license for the Subway Inn tavern located at 1549 West Division Street, Chicago, Illinois. She had operated the tavern since 1967 and resided in the same building in which the tavern is located.

Based on events which occurred on October 20, 1978, Starnawski was charged by the Chicago local liquor control commission with having: (1) "by and through her agent, Judy Martin, knowingly offered or agreed to perform an act of prostitution for money with L. Lamb, said offer or agreement being made on the licensed premises, contrary to Chapter 38, §11—14(a), Ill. Rev. Stat. 1977"; and (2) "by and through her agent, Henry Thomas, who was exercising control over the licensed premises, knowingly permitted the licensed premises to be used for the purposes of prostitution, contrary to Chapter 38, §11—17(a)(1), Ill. Rev. Stat. 1977."

On May 14, 1979, proceedings to revoke Starnawski's retail liquor license were held. Deputy Liquor Control Commissioner Max Rittenberg presided at the evidentiary hearing. Jory Wishnoff, assistant corporation counsel for the City of Chicago, called, as the City's sole witness, Officer Leslie Lamb.

Officer Lamb testified that he was a Chicago police officer, assigned at that time to the Sixth District. On October 20, 1978, at approximately 1:20 a.m., he entered the Subway Inn. He was dressed in civilian attire.

Upon entering the premises, he looked for a seat at the bar, sat down and ordered a drink from the bartender, Henry Thomas.

Lamb asked Thomas "where all the women were because there were only two women in the place, and he [Thomas] told me that they had been in earlier but they had just left before my arrival." Lamb told Thomas that he was "looking for a girl to either get a blow job or a lay."

Thomas allegedly replied that he would "take a look outside" if Lamb "really wanted" a girl. Thomas walked outside the tavern and returned three to five minutes later. He told Lamb that he had not seen "any of the girls outside." A few minutes later a female, later identified by Lamb as Judy Martin, entered the tavern.

Thomas called to Judy, and Lamb overheard him ask her if she was "busy." Thomas asked her if she wanted a drink, pointed at Officer Lamb, and told her to sit with Lamb. Thomas then introduced Martin to Lamb.

Lamb told Martin that "my wife had just had a baby and I haven't been laid or had a blow job in a long time and that I was willing to pay her for either one and how much would it cost me." Martin replied that "it would cost $20 for either * * *," and that they could "go around the corner to a hotel." Lamb agreed to pay her the $20. He told her that he only had a $50 bill, but she said, "Don't worry, I'll get Henry to change the fifty." She then called Thomas over to the table where she and Lamb were sitting.

Lamb informed Thomas that "I was going to pay Judy the twenty for a lay and I also wanted to have the money broken so I could pay for the hotel and I would give him a tip for getting her for me." Taking the money out of the tavern's cash register, Thomas "broke the fifty dollar bill" for Lamb. Lamb then paid for the drinks, gave Thomas a five dollar tip and thanked him for "getting Judy." Thomas placed the tip in a glass next to the cash register and remarked that Judy "is all right" and that "Judy would go with [Lamb]."

Lamb and Martin left the tavern together. Once outside, Martin was arrested by Lamb and charged with prostitution. Lamb then reentered the tavern and arrested Henry Thomas, charging him with being the "keeper of a disorderly house."[1]

The only other witness to testify at the revocation hearing was Sophie Starnawski. She stated that from 1967 until January 1978 she had worked in her tavern seven days a week. On January 4, 1978, her son underwent surgery and remained in the hospital until March 10, 1978. On that date Starnawski brought her son home. As he was in a comatose state, it was

---

[1] On cross-examination, Officer Lamb stated that at the time of the arrest of Henry Thomas, Lamb did not summon Starnawski from her apartment above the tavern because he "did not realize that she lived upstairs."

necessary for her to give him constant care and attention. She thereafter hired a bartender, Henry Thomas, to work in the tavern. Starnawski's son died on January 19, 1979.

Following the arrest of Thomas on October 20, 1978, Starnawski "fired him." She stated at the hearing that she was not working in the tavern on the evening of Thomas' arrest, and that she had no knowledge of the events that occurred on the premises at that time. She also stated that she had "never heard" of Judy Martin and that Martin was not in Starnawski's employ.

On July 16, 1979, after reviewing a transcript of the hearing and a report by the deputy commissioner, the local liquor control commissioner for Chicago, Mayor Jane Byrne, revoked Starnawski's license. The commissioner found that "the licensee, by and through her agent, Henry Thomas, who was exercising control over the licensed premises, knowingly permitted the licensed premises to be used for purposes of prostitution."

On July 25, 1979, Starnawski filed an appeal of the revocation order with the License Appeal Commission of the City of Chicago. Prior to the hearing of that appeal, she filed a motion to produce a copy of the deputy commissioner's report to the commissioner. She also filed a motion requesting a *de novo* hearing before the License Appeal Commission. The Commission denied both motions.

On December 6, 1979 the License Appeal Commission affirmed the order revoking Starnawski's liquor license, and on January 14, 1980, the Commission denied her petition for a rehearing. On the same day that her rehearing petition was denied, Starnawski filed a complaint for administrative review. On September 17, 1980, the circuit court of Cook County affirmed the revocation order. Starnawski appeals from that order.

I

Starnawski's initial contention is that where a licensee has claimed that the decision of the local liquor commissioner "is not substantiated by the evidence," refusal to provide the licensee a copy of the hearing officer's report to the commissioner is a denial of due process of law. To determine whether, as Starnawski argues, it is fundamentally unfair to deny a litigant a copy of the report of the only person who had an opportunity to judge the credibility of the witnesses testifying in a proceeding, we consider the relationship between the hearing officer and the commissioner.

Administrative proceedings may be conducted by a hearing officer who refers the case for final determination to a decision-making body which has not "heard" the evidence in person. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 128-29, 357 N.E.2d 785, 791.) The

hearing officer, to comport with due process requirements, must convey his findings, conclusions and impressions of conflicting testimony, by either oral or written report, to the decision-making body. (*Southern Illinois Asphalt Co. v. Environmental Protection Agency* (1973), 15 Ill. App. 3d 66, 80, 303 N.E.2d 606.) Due process does not require that such report be made available to the parties to the proceedings. (See *Ramos v. Local Liquor Control Com.* (1978), 67 Ill. App. 3d 340, 345, 384 N.E.2d 912; see generally 2 Am. Jur. 2d *Administrative Law* §430, at 239 (1962).) Neither the Illinois Dramshop Act nor the Municipal Code of the City of Chicago requires disclosure of such report. The only requirement is that the hearing officer "shall report his findings to the mayor." Chicago Municipal Code, ch. 10, §27.

In the instant case Starnawski asserts that without access to a copy of the hearing officer's report, neither she, nor the License Appeal Commission, nor the courts on administrative review, can determine whether the commissioner, in making her decision, considered the hearing officer's impressions of witness credibility. Starnawski seeks production of the hearing officer's report to support her argument that the commissioner's decision to revoke Starnawski's license "was not substantially supported by the evidence."

It should be noted that the hearing officer's recommendations are not necessarily determinative of the commissioner's decision. The commissioner may accept or reject any of the hearing officer's recommendations and is free to make her own decision based on evidence in the record. (See *Ramos v. Local Liquor Control Com.* (1978), 67 Ill. App. 3d 340, 344-45, 384 N.E.2d 912.) It is the commissioner and not the hearing officer who is responsible for the decision to revoke a liquor license.

Starnawski relies heavily upon the case of *Mazza v. Cavicchia* (1954), 15 N.J. 498, 105 A.2d 545, discussed by the Illinois Supreme Court in *Des Plaines Currency Exchange, Inc. v. Knight* (1963), 29 Ill. 2d 244, 194 N.E.2d 89. In *Mazza* the New Jersey Supreme Court held that an interim report of findings of fact must be made available to the parties prior to the agency's final decision so that an opportunity will exist to correct any factual mistakes or erroneous conclusions. In discussing the *Mazza* holding, our supreme court stated:

> "Although it is indisputable that the procedure of submitting the examiner's report to the parties prior to a final decision is desirable from a practical point of view, the *Mazza* decision, insofar as it establishes this procedure as a constitutional prerequisite to a fair hearing, has been criticized as an unwarranted limitation upon 'the general rule that administrative officers are free to consult with noninvestigating and nonprosecuting staffs and that the only limits

have to do with personal consideration of records and with use of extra record facts.' [Citation.] A conclusion opposite to the *Mazza* case has been reached by several other courts." 29 Ill. 2d 244, 250. Thus, in *Des Plaines Currency Exchange, Inc.*, it is established only that disclosure to the parties of the hearing officer's report to the commissioner is "desirable."

■■ Although several Illinois courts have suggested that it would be "better practice" to disclose to the parties the hearing officer's report to the commissioner, such disclosure has not attained the status of a due process requirement. (See *Ramos v. Local Liquor Control Com.* (1978), 67 Ill. App. 3d 340, 345, 384 N.E.2d 912; *Des Plaines Currency Exchange, Inc. v. Knight* (1963), 29 Ill. 2d 244, 250, 194 N.E.2d 89, 92, *cert. denied* (1964), 376 U.S. 969, 12 L. Ed. 2d 84, 84 S. Ct. 1136.) Therefore, we conclude that in the instant case the nondisclosure to Starnawski of the hearing officer's report was not an abridgment of her due process rights.

## II

Starnawski's second contention is that article VII, sections 5 and 8 of the Dramshop Act (Ill. Rev. Stat. 1977, ch. 43, pars. 149 and 153), which provide for different procedures for reviewing revocation orders based on the population of the community in which the licensed premises is located, create an unconstitutional classification.[2]

Section 8 of article VII provides that in home-rule municipalities[3] of less than 500,000, appeals from all orders of local liquor control commissioners shall be determined in a trial *de novo* before the State Commission, unless the municipality adopts a resolution requiring that such review be based on the official record of proceedings before the local commissioner. Appeals from local commission revocation orders in municipalities of 500,000 or more are to be determined by the License Appeal Commission on review of the official record of the revocation proceedings.

Starnawski contends that by allowing to inhabitants of municipalities of less than 500,000 *de novo* review of liquor license revocation orders and denying such review to inhabitants of municipalities of 500,000 or more,

---

[2] Section 5 (which refers to section 8) provides for appeal from a revocation order: "° ° ° the licensee ° ° ° shall have the privilege ° ° ° of appealing the order to the local license appeal commission and upon the filing of such an appeal by the licensee the license appeal commission shall determine the appeal upon certified record of proceedings of the local liquor commissioner in accordance with the provisions of Section 8 of this article."

[3] Article VII, section 6(a) of the 1970 Illinois Constitution entrusts home-rule authority to any municipality having a population in excess of 25,000. Other municipalities are permitted to become home rule units by referendum.

the Dramshop Act creates an arbitrary and discriminatory legislative classification in violation of article IV, section 13 of the Illinois Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This contention has already been considered and rejected by this court in the case of *Rincon v. License Appeal Com.* (1978), 62 Ill. App. 3d 600, 605-06, 378 N.E.2d 1281.[4]

In *Rincon* the court stated:

> "It is competent for the legislature to determine upon what basis a distinction may be made for the purpose of statutory classification. The prohibition against special and local legislation does not prohibit classification nor does it mean a statute must affect everyone or every locality in the same way. It means that 'a law shall operate uniformly throughout the State in all localities and on all persons *in like circumstances and conditions*. [Citations.]'
>
> \* \* \* *A legislative classification based on population is valid if there is a reasonable basis for it*. [Citations.] \* \* \* (Emphasis added.)
>
> Densely populated municipalities present problems of complexity and volume not encountered in less populated municipalities. It was not unreasonable for the legislature to conclude that despite the desirability of a hearing *de novo*, such review in municipalities of over 500,000 was simply impractical and that a review limited to the record was necessary to ensure the timely and effective discharge of the License Appeal Commission's duties. *The Illinois Supreme Court 'has frequently held that differences in the size of the municipalities may raise special or unique problems in connection with many activities which justify classification \* \* \*'* [Citations]." (Emphasis added.) 62 Ill. App. 3d 600, 605-06.

■■ In the case at bar appellant Starnawski has provided this court with no argument that would persuade us to depart from the holding in *Rincon*: that the legislature did not act unreasonably or arbitrarily in differentiating between municipalities with a population of 500,000 or more and those with less population.

---

[4] In *Rincon* the appellant contended that section 8 of article VII of the Dramshop Act created an arbitrary and discriminatory legislative classification in violation of article IV, section 13 of the Illinois Constitution. The contention that such provision of the Dramshop Act also violated the Federal equal protection clause was not raised. The latter contention was met in the case of *Maldonado v. License Appeal Com.* (1981), 100 Ill. App. 3d 639, 427 N.E.2d 225, in which it was stated that the *Rincon* analysis "is similarly applicable when analyzing [section 8] in terms of equal protection. Although [article IV, section 13 of the Illinois Constitution] is not identical to the equal protection clause, it supplements the equal protection clause [citations] and the two provisions are generally judged according to the same standards." Based on the rationale employed by the *Rincon* court, in its holding that section 8 did not violate the Illinois Constitution, the court in *Maldonado* held that section 8 was not violative of the equal protection clause.

### III

Starnawski's third contention is that Officer Lamb's conversation with Judy Martin is hearsay and thus was improperly admitted into evidence during the license revocation proceeding. Starnawski objects to that part of Lamb's testimony in which he stated, "Judy told me that it would cost $20.00 for either a blow job or a lay, whichever I desired and we would go around the corner to a hotel that was about a block away."

Starnawski argues that Lamb's conversation with Martin, offered by the city to establish that an act of prostitution occurred on the licensed premises, is hearsay because it "includes the statements of a third party made out of court * * * and is offered to show the truth of the matters contained therein."

Hearsay evidence has been defined as:

> "Testimony in court * * * offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." E. Cleary & M. Graham, Handbook of Illinois Evidence §801.1, at 392 (1979).

The city urges that the value of Officer Lamb's testimony does not rest upon the credibility of an out-of-court asserter. Lamb was simply describing an incident in which he was a participant. He testified under oath, and Starnawski had ample opportunity to cross-examine Lamb concerning his recollection of the incident.

In *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, the Illinois Supreme Court noted that the "fundamental purpose of the hearsay rule * * * is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered."

In the instant case Lamb was not merely repeating the assertions of an unavailable witness as to some remote event. Officer Lamb was a participant in the conversation to which he testified and he was available for cross-examination. Thus, we hold that Lamb's testimony as to the conversation between him and Martin was not hearsay, and its admission was not error.

### IV

Starnawski's final contention is that the decision of the commissioner is not supported by the manifest weight of the evidence.

The finding of the commissioner was that "the licensee, by and through her agent, Henry Thomas, who was exercising control over the licensed premises, knowingly permitted the licensed premises to be used for the purposes of prostitution, contrary to chapter 38, §11—17(a), Ill. Rev. Stat. 1977." It is clear that if this finding was supported by substantial

evidence, it constituted a sufficient cause for the order of license revocation.[5] See Ill. Rev. Stat. 1977, ch. 43, par. 149; *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 254 N.E.2d 814.

Officer Lamb testified that while he was sitting at the bar in the Subway Inn, dressed in civilian attire, he told the bartender that he was "looking for a girl" with whom he could have sexual relations. The bartender told Lamb that he would "take a look outside." Thomas, the bartender, walked outside and returned three to five minutes later. Lamb stated that there were perhaps six or seven other patrons in the tavern at that time.

Shortly after the bartender returned to the tavern, Judy Martin entered. The bartender called to Martin, briefly spoke with her and motioned toward Officer Lamb. Lamb testified that Martin then sat down next to Lamb, after which the bartender walked over to where they were sitting and introduced Lamb to Martin. A conversation ensued between Martin and Lamb in which the woman stated that she would engage in sexual relations for $20. She then called the bartender over so that Lamb could "break a fifty" dollar bill.

Lamb told the bartender that he needed "change from the fifty" so that he could pay $20 to Martin, pay for a hotel room, and give a $5 tip to the bartender. The bartender accepted the tip, placed the tip in a glass next to the cash register and remarked that "Judy is all right" and that "Judy would go with [Lamb]."

Starnawski argues that Lamb's testimony is incredible. She urges that a bartender would not leave the tavern unguarded for three to five minutes. She also maintains that the police officer cannot be believed because, on cross-examination, he had some difficulty recalling whether there was a juke box and/or a pool table in the tavern.

In administrative review proceedings the trial court and the appellate court are limited to a consideration of the record to determine (1) whether

---

[5] Section 11—17(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 11—17(a)) provides:
"Any person who has or exercises control over the use of any place which could offer seclusion or shelter for the practice of prostitution who performs any of the following acts keeps a place of prostitution:
(1) Knowingly grants or permits the use of such place for the purpose of prostitution; or
(2) Grants or permits the use of such place under circumstances from which he could reasonably know that the place is used or is to be used for the purposes of prostitution; or
(3) Permits the continued use of a place after becoming aware of facts or circumstances from which he should reasonably know that the place is being used for purposes of prostitution."
The act of "prostitution" is defined as "° ° ° any person who performs, offers or agrees to perform any of the following acts for money ° ° ° (1) any act of sexual intercourse; or (2) any act of deviate sexual conduct ° ° °." Ill. Rev. Stat. 1977, ch. 38, par. 11—14.

the findings and orders of the commissioner are contrary to the manifest weight of the evidence, and (2) whether the commissioner acted arbitrarily and without cause or in clear abuse of his discretion. The findings and conclusions of the agency on questions of fact are accepted as prima facie true and correct (Ill. Rev. Stat. 1977, ch. 110, par. 274), and courts have generally held that it is not the function of either the trial court or the appellate court to reweigh the evidence or assess the credibility of the witnesses. (*Spiros Lounge, Inc. v. Illinois Liquor Control Com.* (1981), 98 Ill. App. 3d 280, 423 N.E.2d 1366.) It is the commissioner as the trier of fact who is authorized to assess credibility, weigh the evidence, reconcile conflicting evidence, and determine which witnesses are worthy of belief. *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 277, 254 N.E.2d 814.

■■ It appears from the record that Officer Lamb informed Henry Thomas, the bartender, that he was "looking for a girl," and that Thomas said that he would "take a look outside." Subsequently Thomas introduced Judy Martin to Lamb, and shortly thereafter Thomas was made aware of the fact that Martin had agreed to perform for money sexual acts with Lamb. Thus it is reasonable to infer that Thomas, as Starnawski's agent, knowingly permitted acts of prostitution to be transacted on the licensed premises. (Ill. Rev. Stat. 1977, ch. 38, par. 11—17(a)(1).) Officer Lamb's testimony, if believed, was adequate to support the license revocation. Therefore, we conclude that the decision of the local liquor control commissioner was not contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P. J., and DOWNING, J., concur.