JASPER BROCK, Petitioner-Appellant, v. POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Respondents-Appellees.

First District (2nd Division)   No. 1—89—3291

Opinion filed November 7, 1990.

Law Offices of Joseph V. Roddy, of Chicago (Joseph V. Roddy and Thomas J. Pleines, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel, Chicago (Ruth M. Moscovitch and Michelle A. Hutchinson, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Petitioner, Jasper Brock, appeals from the circuit court's order affirming his discharge as a Chicago police officer by respondents, Police Board of the City of Chicago (Board). Petitioner was found guilty of violating Chicago Police Department Rules 1, 2 and 6 in that analysis of his urine specimen revealed a quantity of cocaine metabolite. Petitioner raises as issues for review whether respondents' decision was against the manifest weight of the evidence and whether he was afforded a full and fair due process hearing. No issue is raised as to the propriety of discharge as the result of rules' violations.

On March 18, 1987, the Chicago police superintendent charged petitioner with breaking Chicago Police Department Rules 1 ("violation of any law or ordinance"); 2 ("any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department"); and 6 ("disobedience of any order or directive, whether written or oral"). Petitioner pled not guilty and

was represented by counsel. Respondents' hearing officer, William H. Hall, conducted administrative hearings commencing on February 10, 1988. The following evidence was presented at the hearings and recorded in written transcripts subsequently presented to respondents for consideration and decision.

Called by the Chicago police department (Department), the following witnesses testified. James Walsh, an employee of American Institute for Drug Detection (AIDD), operated an EMIT instrument used for drug screening. On February 26, 1986, he ran a test on petitioner's urine specimen, which indicated the presence of cocaine in the sample. The parties stipulated to the specimen's chain of custody. Walsh did not run a second test on the specimen. The EMIT test has a 5% false positive rate.

Joyce Mah, employed by AIDD as an administrative supervisor, calibrated the subject EMIT machine on February 26, 1986, at 7 a.m. She performed a gas chromatography and mass spectrometer (gc/ms) test on petitioner's urine specimen on February 27, which confirmed the presence of cocaine metabolite.

Jan Johnson, senior toxicologist at AIDD, personnel supervisor, reviewer and certifier of all data results generated in the lab, explained that the EMIT test detects the presence of drugs or chemicals in the specimen. The gc separates chemicals by properties of molecular weight and polarity, while the ms fragments molecules and measures the intensity of the ions produced from that fragmentation. Based on the graphs and data taken from the tests run on petitioner's specimen, Johnson stated that both the EMIT and the gc/ms machines were properly calibrated. The results showed that cocaine metabolite was present in the specimen. The gc/ms test is used as a confirmation test because the EMIT test has a 5% margin of error.

Petitioner testified as an adverse witness. He joined the Chicago police department on February 27, 1978, and was on suspension at the time of the hearing. He provided a urine specimen on February 15, 1986.

The Department thereafter rested its case. Petitioner's motion for a finding in his favor was taken under advisement.

In his own behalf, petitioner testified that his first police assignment was as a patrolman in the first district, where he worked for three years. He was then transferred to Cabrini Green and subsequently reassigned to the public housing unit south. He did not use cocaine prior to February 15, 1986, and had never used it. He admitted, however, that at the time of testing he had had a drinking problem and "would blackout because I was drinking and *** taking medi-

cine for my headaches." During this period, petitioner drank a pint of cognac a day and was taking over-the-counter medicines. Also, he drank three different types of herbal tea.

Prior to the suspension, petitioner stopped drinking. The parties stipulated that on February 16, 1986, petitioner went to Michael Reese Hospital and had another drug test conducted, which was negative for the presence of cocaine.

Following argument by counsel representing both parties, the hearing officer took the case under advisement.

Transcripts of the hearing were forwarded to respondent members, who subsequently found petitioner guilty on each charge and ordered his discharge on April 15, 1988. Petitioner thereafter sought administrative review (Ill. Rev. Stat. 1987, ch. 110, par. 3—103) in the circuit court.

On June 28, 1988, petitioner moved for remand, alleging that newly discovered evidence existed relative and material to the charges against him. Attached to the motion was the sworn statement of one Cornell Smith. Assertedly, Smith put cocaine in a drink accidentally consumed by petitioner at the funeral of a mutual family friend. The court granted the motion. Respondents' hearing officer Hall held another hearing on November 29, 1988.

At the November hearing, Smith testified that he had been a narcotics user from 1971 through 1986. He had been arrested numerous times and was convicted three times. Smith knew petitioner for over 30 years. Petitioner was a friend of Smith's younger brother, Larry. On February 13, 1986, Smith attended services at a funeral home on 79th and Wabash. After the service, Smith, who had been drinking that day, went out to the parking lot and drank some more whiskey with approximately 10 other men, including petitioner. The men drank from disposable cups, which all looked alike. Smith had a half gram of what he believed to be cocaine with him that night, and he put some in his drink because he did not want anyone to know he was doing it. After taking a sip, he put the drink down on the hood of a car, and others followed suit. Petitioner, who was talking with someone, put his cup down next to Smith's cup and then picked up Smith's cup by mistake. Smith did not tell petitioner that he had the wrong cup "because by him drinking whiskey the way he was and doing cocaine, I didn't think it was going to hurt him. I said I will sit back and watch him trip." Petitioner went home shortly after the incident.

During the next two years, Smith sought drug abuse treatment. He did not see petitioner again until May 1988, when the two met by chance on the street. Smith had heard that petitioner's wife had been

killed and extended condolences. Smith had also heard that petitioner had been fired by the police department, but did not know the circumstances surrounding the termination. He then told petitioner about the incident at the funeral home because, as part of his drug treatment, he had to apologize to "those he had wronged." Petitioner became angry and told Smith to contact his lawyer.

Dr. John Ambre, associate professor of internal medicine at Northwestern University, reviewed the data from petitioner's drug test, which revealed the presence of a very small amount of cocaine. In his opinion, the ingestion of cocaine in a drink as claimed could produce the results which were reflected in petitioner's records. If another test was conducted the next day, the test may not register positive. On cross-examination, Dr. Ambre conceded that he had testified previously before the Board between 15 and 20 times and this was the first time he had supported the correctness of AIDD's results. He criticized AIDD in the past because it is an "amazingly bad laboratory." He has always testified on behalf of the employee subject to discharge.

Petitioner again testified in his own behalf. His testimony mirrored Smith's. Petitioner knew Smith since he was five years old and was a good friend of his brother, Larry. After the funeral, petitioner and his wife stopped in at a birthday party, but did not stay long. At home, petitioner experienced difficulty in sleeping. He denied knowing that he had ingested cocaine on February 13, 1986.

After reviewing the November hearing transcript, the Board reaffirmed its previous April 1988 ruling in the "Findings and Decision" it issued December 19, 1988.

Following briefing and argument on administrative review, the circuit court affirmed the Board's findings and decision orally and in a draft order date stamped by the clerk on October 27, 1989. The order was signed by the judge in what appears to be the judge's handwriting, as of October 29, 1989. On November 13, 1989, petitioner moved to "amend the Petition for Administrative Review *** to conform to the briefs and arguments of the parties." He sought to incorporate into his petition his argument that the failure of the Board's hearing officer to advise as to the credibility of the witnesses and the failure of the Board to adopt findings of the hearing officer deprived petitioner of a full and fair hearing. This argument was advanced at the October 27 hearing and rejected by the court. At the hearing on the motion, petitioner's counsel stated that he "was trying to preserve the issue that the hearing officer did not advise the Board as to the issue of credibility and the Board did not see or hear the witnesses,

which is what we argued before you." The motion was allowed in a supplemental order entered on November 13, 1989. The notice of appeal was filed on November 28, 1989.

I

The Board initially asserts that this court lacks jurisdiction to hear the appeal. This issue was raised by the Board in a motion to dismiss the appeal, which was first denied by this court. The order was later vacated and still later reinstated.

■ Petitioner advances two arguments in support of the propriety of entertaining this appeal. First, the November 13, 1990, order "disposed of a timely filed post-trial motion" within the meaning of Supreme Court Rule 303 (107 Ill. 2d R. 303). In all nonjury cases, a motion qualifying as a "post-trial motion" must specifically request one of the forms of relief listed in subsection (a) of section 2—1203 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 2—1203), which include (1) rehearing, (2) retrial, (3) modification of judgment, (4) vacation of judgment, or (5) "for other relief." (*In re Marriage of Hillinger* (1986), 146 Ill. App. 3d 549, 555, 497 N.E.2d 112.) None of the first four forms of relief enumerated in the statute were sought by petitioner. The "other relief" referred to in subsection (a) must be similar in nature to the forms of relief specified immediately preceding the reference. *Fultz v. Haugan* (1971), 49 Ill. 2d 131, 273 N.E.2d 403. See also Ill. Ann. Stat., ch. 110, par. 2—1203, Historical & Practice Notes, at 366 (Smith-Hurd 1983).

■ Petitioner intended to amend his complaint to conform with the proofs after trial, a section 2—616(c) motion to amend under the Code (Ill. Rev. Stat. 1987, ch. 110, par. 2—616(c)). Such a motion may be filed at any time; however, it is not similar in nature to the "other relief" referred to in section 2—1203 and is not a motion directed against the judgment. (See *Marsh v. Evangelical Convenant Church* (1990), 138 Ill. 2d 458, 461-62, 563 N.E.2d 459; *Fultz v. Haugan*, 49 Ill. 2d at 136; *Sears v. Sears* (1981), 85 Ill. 2d 253, 258, 422 N.E.2d 610.) The November 13 order, by its own terms, merely "supplements" the court's October decision and was entered in response to a motion not directed against the judgment. Entry of the November 13, 1989, order, therefore, does not control the jurisdictional issue raised here.

■ Petitioner's second argument is that the October 27 order was not signed by the judge until October 29; therefore, his notice of appeal was timely filed. The record reveals that the court heard argument on the petition for administrative review on October 27, 1989. The court thereafter orally gave its ruling, denying the petition.

Counsel for the Board then asked whether he should prepare a draft order. The court agreed, stating "that's the best way." The Board's attorney thereafter drafted an order to reflect that the Board's decision was affirmed, based on the reasons stated in open court. Although it appears that the courtroom clerk stamped "October 27, 1989," on the draft order and returned copies of the order to both parties, the original order appears to have been signed by the judge on October 29, 1989, according to the handwritten date affixed to the order filed. No explanation for this discrepancy in dates was ever sought from the judge himself; instead, both parties have contented themselves with speculative and circumstantial interpretations. In the absence of direct clarifying evidence, we elect to assume that the order was signed by the judge on the handwritten date it bears, October 29, 1989, and was thereafter filed. (107 Ill. 2d R. 272.) The notice of appeal, therefore, will be treated as timely filed on November 28, 1989. 107 Ill. 2d R. 301.

II

Petitioner claims the findings of the Board are against the manifest weight of the evidence and should have been so regarded by the circuit court.

■ The undisputed evidence in the record here is that the urinalysis of petitioner's specimen revealed the presence of cocaine metabolite in his system. The controversy centers upon the weight, if any, to be given petitioner's denial of ever using cocaine and Smith's averment that he laced cocaine into a drink ultimately consumed by petitioner. This testimony, petitioner argues, was unimpeached, as well as the scientific evidence presented. Although Smith was not impeached by outright contradiction, the record reveals several bases upon which the Board could have deemed his testimony impeached, including the facts that he was a former drug addict (see *People v. Givens* (1985), 135 Ill. App. 3d 810, 482 N.E.2d 211); he and his brother were petitioner's long-time friends (see *People v. Strickler* (1977), 47 Ill. App. 3d 419, 362 N.E.2d 28); and he had an extensive criminal history, which included three felony and misdemeanor convictions, and numerous arrests. The Board also may have regarded with suspicion the fortuitous timing of Smith's reappearance in the case, after a two-year hiatus, recalling in minute detail the subject event, although he admittedly had been drinking and using drugs that day and evening. Where a witness is successfully impeached, uncorroborated parts of his testimony may be disregarded by the trier of fact. (*People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364.) No corroboration of

Smith's description of lacing his drink with cocaine appears of record, although he allegedly performed this act in the presence of his friend, Jesse, who had been standing close by.

■ Petitioner also maintains that the evidence did not establish his knowing and intentional ingestion of cocaine. A similar argument was rejected in *Schlobohm v. Rice* (1987), 157 Ill. App. 3d 90, 96, 510 N.E.2d 43. Recognizing that the element of knowledge is frequently not susceptible to direct proof and may be proved by circumstantial evidence from which an inference of knowledge may be reasonably drawn, this court there upheld the use of the drug tests to show the clear and logical implication of prior knowledgeable possession. (See *People v. Harris* (1972), 52 Ill. 2d 558, 560, 288 N.E.2d 385.) A like result is reached in the case at bar.

Based upon the foregoing analysis, the findings of the Board are not against the manifest weight of the evidence. *Rispoli v. Police Board* (1989), 188 Ill. App. 3d 622, 635, 544 N.E.2d 1063.

### III

Petitioner lastly urges that his right to a full and fair due process hearing was denied because the hearing officer failed to advise the decision maker as to his impressions, findings, and conclusions regarding the conflicting testimony.

It is not clear from this record that the hearing officer and the Board did not jointly consider the factual issues at the initial hearing and at the hearing on remand. The three-page "Findings and Decision" reached in this case on April 15, 1988, and the four-page "Findings and Decision" rendered on December 19, 1988, reveal that the hearing officer signed the last pages of the findings in each instance and the Board members signed the last pages, entitled "Decision," setting forth the case disposition based upon those findings. Petitioner admits that the Board's usual procedure is to make transcripts available for the members of the Board to read prior to making their decision. There is no evidence that this procedure was not followed here, nor is there any evidence that the Board did not confer with the hearing officer. Because of his signature on the last pages comprising the "Findings" in this case, the assumption that the hearing officer was involved in the factual considerations to be evaluated is stronger than the conjecture that he was not. The presence of his signatures on the findings, but not the decisions, are otherwise inexplicable.

Assuming, *arguendo*, that the hearing officer did not participate in deciding the factual issues underlying the disposition of the case,

the authorities cited by petitioner, *Southern Illinois Asphalt Co. v. Environmental Protection Agency* (1973), 15 Ill. App. 3d 66, 303 N.E.2d 606, *aff'd* (1975), 60 Ill. 2d 204, 326 N.E.2d 406, *Starnawski v. License Appeal Comm'n* (1981), 101 Ill. App. 3d 1050, 428 N.E.2d 1102, and *Rispoli v. Police Board* (1989), 188 Ill. App. 3d 622, 544 N.E.2d 1063, do not yield in his favor the result sought.

In *Southern Illinois Asphalt*, the court ruled that it would be "better practice" to have the hearing officer report his conclusions and impressions to the fact-finding body; however, the court did not conclude that due process required such a result. (*Southern Illinois Asphalt*, 15 Ill. App. 3d at 80-81.) In *Starnawski*, the court noted that the Municipal Code of Chicago, chapter 101, section 27, provided that the hearing officer "*shall* report his findings to the mayor." (Emphasis added.) (*Starnawski*, 101 Ill. App. 3d at 1054.) Here, the hearing officer "*may* \*\*\* make findings of fact, conclusions of law and recommendations to the Police Board following the hearing." (Emphasis added.) (Chicago Municipal Code §30 (1990).) Further, the court held in *Starnawski* that the licensor's due process rights were not violated by the commission's failure to acknowledge the hearing officer's oral or written report. This issue was discussed with relation to the procedures followed by the Chicago Police Board in *Rispoli*. There, the court noted the absence of evidence in the record showing whether, or not, the Board complied with what that court thought was mandated by *Southern Illinois Asphalt*. (*Rispoli*, 188 Ill. App. 3d at 634.) Petitioner there, however, was deemed to have waived the issue and, once again, the due process question was not reached.

■ Due process requires a proceeding with fairness insured by procedural safeguards including proper notice and an opportunity to be heard. (*Ciechon v. City of Chicago* (7th Cir. 1982), 686 F.2d 511.) Although some courts may consider it a "better practice" for an administrative tribunal which has not itself heard the evidence to base its decision on a report made by the hearing examiner, Illinois courts have not held this to be a due process requirement. (*American Welding Supply Co. v. Department of Revenue* (1982), 106 Ill. App. 3d 93, 98, 435 N.E.2d 761.) Due process is satisfied when the decision-making body considers the evidence contained in the report of proceedings before the hearing officer and bases its determination upon it; therefore, the due process principle that the "one who decides must hear" does not prohibit the practical administrative procedure of having a hearing officer take evidence and the decision maker render findings, as long as the decision maker considers the evidence that

justifies it. (*Morgan v. United States* (1936), 298 U.S. 468, 481-82, 80 L. Ed. 1288, 1295, 56 S. Ct. 906, 911-12; *Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 128-29, 357 N.E.2d 785; *American Welding Supply Co.*, 106 Ill. App. 3d at 98-99. See also *McCabe v. Department of Registration & Education* (1980), 90 Ill. App. 3d 1123, 413 N.E.2d 1353, *cert. denied* (1981), 454 U.S. 838, 70 L. Ed. 2d 119, 102 S. Ct. 143.) Indeed, " '[n]othing in *** [*Morgan*] suggests that the decider must actually hear the witnesses *or be furnished with a report on their credibility.*' " (Emphasis added.) (*Guerrero v. New Jersey* (3d Cir. 1981), 643 F.2d 148, 150, quoting *Utica Mutual Insurance Co. v. Vincent* (2d Cir. 1967), 375 F.2d 129, 132, *cert. denied* (1967), 389 U.S. 839, 19 L. Ed. 2d 102, 88 S. Ct. 63.) Even where a report by the hearing officer is made to the decision maker, the latter may, constitutionally, disregard it where its own resolution is supported by substantial evidence. *United States v. Raddatz* (1980), 447 U.S. 667, 680, 65 L. Ed. 2d 424, 436, 100 S. Ct. 2406, 2414-15; *Moore v. Ross* (2d Cir. 1982), 687 F.2d 604, 608, *cert. denied* (1983), 459 U.S. 1115, 74 L. Ed. 2d 969, 103 S. Ct. 750.

■ The instant record reveals that each member of the Board was to receive a transcript of proceedings. In its "Findings and Decision," the Board reaffirmed its earlier ruling "after considering the new testimony as ordered." Each Board member signed the "Decision." Petitioner does not urge error concerning notice or the impediment of his right to be heard. Accordingly, the hearing complied with the requirements of due process.

For the reasons set forth above, the circuit court's order, affirming the decision of the Chicago Police Board, itself must be affirmed.

Affirmed.

DiVITO, P.J., and SCARIANO, J., concur.