CONTINENTAL MOBILE TELEPHONE COMPANY, INC., Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

First District (4th Division)    No. 1—93—2058

Opinion filed December 30, 1994.

Sachnoff & Weaver, Ltd. (Nathan H. Dardick, Morton Denlow, and Michael D. Richman, of counsel), and John L. Rogers, both of Chicago, for appellant.

David L. Nixon, Special Assistant Attorney General, and Mayer, Brown & Platt, both of Chicago (Stephen J. Mattson, Michele Odorizzi, Christian F. Binning, Barbara E. Cohen, and Ellen Chapelle, of counsel), for appellee Illinois Commerce Commission.

Dennis L. Myers and John C. Gockley, Jr., both of Ameritech Mobile Communications, Inc., of Hoffman Estates, for appellee Chicago SMSA Limited Partnership.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

Continental Mobile Telephone Company, Inc. (Continental), appeals from an order of the Illinois Commerce Commission (Commission) which found that Chicago SMSA Limited Partnership (CSLP) did not engage in unfair and anticompetitive practices in providing Continental with cellular radio service. We consider: (1) whether this court should review the Commission's decision *de novo* because the successor hearing examiner who issued the proposed decision did not conduct the hearing; (2) whether the assignment of a successor hearing officer who did not hear the testimony (a) cannot be challenged on appeal because Continental did not object until after the proposed order was issued, (b) rendered the Commission's order void because it was not authorized by statute, or (c) violated due process; (3) whether the Commission's decision was supported by substantial evidence; and (4) whether the Commission appropriately applied section 13—

203 of the Universal Telephone Service Protection Law of 1985 (220 ILCS 5/13—203 (West 1992)). For the following reasons, we affirm.

Continental is a reseller of cellular radio service. It purchases the service in bulk at wholesale prices from CSLP, operating under the trade name Ameritech, and Cellular One, which are the two facilities-based carriers in the Chicago area licensed by the Federal Communications Commission (FCC). In turn, Continental resells the service at retail prices to its customers. Continental's profit is based on the difference between the wholesale rate at which it buys the service and the retail rate at which it sells the service to consumers. CSLP and Cellular One also sell the service at retail, and when doing so, compete directly with Continental and other resellers.

Continental filed a complaint with the Commission on March 6, 1991, alleging that CSLP engaged in unfair and anti-competitive practices when it offered certain discount plans without offering Continental a wholesale rate on the plans and when it offered equipment to customers for little or no cost in exchange for an agreement that the customer maintain his service with CSLP, a practice known as "bundling." Continental requested that the Commission order CSLP to provide Continental with a competitive wholesale rate for each retail rate and plan CSLP offered to consumers.

In a hearing before the Commission, the following evidence was presented. The direct and rebuttal testimony of five witnesses was submitted in written form and they were cross-examined before the hearing examiner.

Before 1987, the Commission regulated the rates charged by the carriers, including CSLP, and the margin between Continental's wholesale rates and the retail rates was about 24%. On CSLP's petition and over the objections of Continental and other resellers, the Commission excluded cellular radio service from active regulatory oversight in 1987 based on its finding that regulation was unnecessary due to the competitiveness of the marketplace. In its order, the Commission recognized that resellers contribute to the competitiveness of the cellular market. It also stated that: "the ability of the reseller to function in the cellular market is dependent on the margin between the facilities-based carriers' wholesale and retail rates, and that without direct Commission supervision over the rates of the carriers they have the ability to reduce the margin in an attempt to squeeze the resellers out of the market" which would have an anti-competitive effect. After deregulation, CSLP continued to provide Continental with a margin of about 24% between the wholesale and retail rates until mid-1989.

Beginning in 1989, CSLP offered discount plans to target certain

groups of retail customers such as realtors, printers, and small business owners. The plans were offered in response to similar plans offered by Cellular One. The discounted price was 20% less than the standard retail rate CSLP offered and despite Continental's request, CSLP did not offer it a discounted wholesale rate on these plans. Continental believed it could not effectively compete with CSLP for the customers targeted in the group plans.

CSLP and Continental entered into an agreement on rates in October 1989 under which there were two pricing options. Option A allowed Continental a 23.5% margin on seven specific retail plans that CSLP offered at the time, excluding the discounted group plans. Option B allowed Continental a margin of at least 23.5% and up to 30% on CSLP's blended retail rate, which was a weighted average price charged to CSLP's retail and discount customers, depending on Continental's sales. Continental chose option B.

Subsequently, CSLP announced it would increase its retail rates. After Continental and other resellers attacked the price increase in advertisements, CSLP rescinded the price increase and, on the same day, offered a new discounted group plan aimed at businesses. CSLP did not offer resellers a discounted wholesale rate on the business plan. The business customers were the most desirable retail customers because they used the service more than other customers. CSLP did not offer Continental a wholesale rate on the business plan because it would have been difficult to compete with Continental. In addition, CSLP offered a Chicago Mercantile Exchange plan and did not offer resellers a discounted wholesale rate off that plan.

In response, Continental filed a complaint in the circuit court for declaratory, injunctive, and other relief. Summary judgment was granted on one count and the other counts were dismissed for failure to state a cause of action. That decision was affirmed on appeal. (*Continental Mobile Telephone Co. v. Chicago SMSA Limited Partnership* (1992), 225 Ill. App. 3d 317, 587 N.E.2d 1169.) While that case was pending, Continental filed its complaint with the Commission.

After the hearings on Continental's complaint with the Commission, the hearing examiner who heard the testimony resigned and a successor hearing examiner was assigned to the case. The successor hearing examiner issued a proposed order recommending that the Commission dismiss Continental's complaint with prejudice. There was no reference in the proposed order that the examiner who heard the testimony conveyed her findings, impressions, and conclusions to the successor hearing examiner.

Continental filed a brief on its exceptions to the proposed order arguing, among other things, that it was denied due process because

the hearing examiner who issued the proposed order did not preside over the hearing. The hearing examiner then issued a modified proposed order to the Commission recommending that it deny Continental's complaint. The Commission adopted the proposed order and denied the complaint. After its application for rehearing was denied, Continental filed a timely petition for review with this court.

OPINION

On appeal from an order of the Commission, the reviewing court must consider the Commission's findings of fact as *prima facie* true and its rules, regulations, orders, and decisions as *prima facie* reasonable. (220 ILCS 5/10—201(d) (West 1992).) The appellant bears the burden of proof on all issues raised in the appeal. (220 ILCS 5/10—201(d) (West 1992).) The Commission's order shall be reversed if its findings were not supported by substantial evidence, it did not have jurisdiction to issue the order, the order violated the State or Federal constitution or laws, or the proceedings or manner in which the order was considered and decided violated the State or Federal constitution or laws to the prejudice of the appellant. (220 ILCS 5/10—201(e)(iv) (West 1992).) However, the Commission's interpretation of a question of law is not binding on appeal and is subject to *de novo* review. *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1992), 148 Ill. 2d 348, 592 N.E.2d 1066.

I

Continental first argues that this court should not apply the usual deference to the Commission's findings on questions of fact because neither the hearing examiner who prepared the proposed order nor the Commission heard the testimony of the witnesses.

■ The power of this court to review the Commission's decisions is limited by statute. (220 ILCS 5/10—201 (West 1992); *People ex rel. Hartigan*, 148 Ill. 2d 348, 592 N.E.2d 1066.) The Public Utilities Act requires this court to consider the Commission's findings and conclusions on questions of fact to be *prima facie* true and as found by the Commission. (220 ILCS 5/10—201(d) (West 1992).) This court may not reweigh the evidence or make an independent determination of the facts. (*Meyers v. Illinois Department of Public Aid* (1983), 114 Ill. App. 3d 288, 448 N.E.2d 1176.) Continental's argument is directly contrary to the mandate of the statute and, as a result, it is rejected.

II

Continental raises two challenges to the Commission's order based on the assignment of the successor hearing examiner. It

contends that the order was void because the assignment was not authorized by statute and that it was denied due process because the successor hearing examiner did not hear the testimony of the witnesses.

■ CSLP responds that Continental waived any challenge to the appointment of the successor hearing examiner because it did not object until after the hearing examiner issued his proposed order denying Continental relief. However, the Public Utilities Act, which is the enabling act for the Commission (220 ILCS 5/2—101 *et seq.* (West 1992)), only limits the grounds of appeal from a decision of the Commission to this extent: "No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission." (220 ILCS 5/10—113 (West 1992).) In this case, Continental raised both of the challenges to the assignment of the successor hearing examiner it now raises on appeal in its application for rehearing. As a result, Continental did not waive the issue. Further, contrary to CSLP's argument, the Commission did not find that Continental had waived the issue in its final order. The Commission found that the objection raised in Continental's brief on exceptions to the proposed order was "untimely," but then it briefly considered the issue on its merits. The Commission did not consider the issue waived and this court will not do so.

As one of its challenges to the assignment of the successor hearing officer, Continental maintains that the Commission's order is void because the Public Utilities Act requires the hearing examiner who presided at the hearing to issue the proposed order. No other statute, according to Continental, authorized a successor hearing examiner who did not participate in the hearing to issue the proposed order.

An administrative agency has only such powers as allowed under its enabling statute. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 357 N.E.2d 785.) The Commission derives its power from the Public Utilities Act and any orders inconsistent with the Act are void. *Illinois Power Co. v. Illinois Commerce Comm'n* (1986), 111 Ill. 2d 505, 490 N.E.2d 1255.

Continental relies on section 10—111 of the Public Utilities Act, which provides:

> "In any hearing, proceeding, investigation or rulemaking conducted by the Commission, the Commission, commissioner or *hearing examiner presiding*, shall, after the close of evidentiary hearings, prepare a recommended or tentative decision, finding or order including a statement of findings and conclusions and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record." (Emphasis added.) (220 ILCS 5/10—111 (West 1992).)

"Preside" is defined as: "direct, control, or regulate proceedings as chief officer." (Webster's Third New International Dictionary 1794 (1986).) Continental urges that section 10—111 and the definition of "preside" require the hearing examiner who heard the testimony of the witnesses at the hearing to issue the proposed order.

■ The Public Utilities Act does not expressly provide for the appointment of a successor hearing examiner and the Commission does not rely on any of its rules to support its action. Section 10—101 of the Public Utilities Act provides: "Hearings shall be held either by the Commission or by one or more commissioners or hearing examiners." (220 ILCS 5/10—101 (West 1992).) Although this section does not expressly allow the Commission to appoint a successor hearing examiner, it contemplates that more than one examiner may be appointed to a case.

Other statute sections are also relevant. The Public Utilities Act expressly states that the Illinois Administrative Procedure Act (5 ILCS 100/1—1 *et seq.* (West 1992)) applies "[i]n the conduct of any investigation, inquiry or hearing." (220 ILCS 5/10—101 (West 1992).) Section 10—45 of the Illinois Administrative Procedure Act states: "The proposal for decision shall contain a statement of the reasons therefor and of each issue of fact or law necessary to the proposed decision and shall be prepared by the persons who conducted the hearing or one who has read the record." 5 ILCS 100/10—45 (West 1992).

The crux of Continental's argument that the Commission's action was not authorized to appoint a successor hearing officer is the use of the word "presiding" in section 10—111 of the Public Utilities Act. However, the definition of the word does not support the conclusion that only the person who conducted the actual hearing is a "hearing examiner presiding" under section 10—111. Proceedings before the Commission include aspects other than the hearing where testimony is taken. The definition is consistent with the conclusion that a hearing examiner appointed to a case is presiding over the case whether it is in the pleading stage, discovery stage, hearing stage, or decision stage. In this case, the successor hearing examiner was presiding over the case during the decision stage and, therefore, had the authority under section 10—111 of the Public Utilities Act to issue the proposed order. Also, because section 10—45 of the Illinois Administrative Procedure Act expressly allows a hearing examiner to issue a proposed decision based on reading the record, the Commission's action in this case of allowing the successor hearing examiner to issue the proposed order based on reading the record was within its statutory authority and not void.

As its second challenge to the assignment of the successor hear-

ing examiner, Continental argues that to comply with due process requirements, the hearing examiner who heard the testimony should have conveyed her findings and impressions of the witnesses' credibility to the Commission. It also contends that the successor hearing officer improperly determined the witnesses' credibility when he did not hear their testimony but only read the record.

Continental relies on *Starnawski v. License Appeal Comm'n* (1981), 101 Ill. App. 3d 1050, 1053-54, 428 N.E.2d 1102, 1106, where the court stated:

> "Administrative proceedings may be conducted by a hearing officer who refers the case for final determination to a decision-making body which has not 'heard' the evidence in person. [Citation.] The hearing officer, to comport with due process requirements, must convey his findings, conclusions and impressions of conflicting testimony, by either oral or written report, to the decision-making body. [Citation.] Due process does not require that such report be made available to the parties to the proceedings."

(See also *Ramos v. Local Liquor Control Comm'n* (1978), 67 Ill. App. 3d 340, 384 N.E.2d 912.) Continental relies on the first two sentences of the quote and ignores that *Starnawski* did not consider the issue presented here. *Starnawski* addressed whether due process entitles a party to the report of a hearing officer; the case does not directly support Continental's position here. In fact, what occurred in this case is consistent with *Starnawski* because the successor hearing officer conveyed his findings to the Commission, which is the ultimate fact finder, although his findings were based on reading the record.

In *American Welding Supply Co. v. Department of Revenue* (1982), 106 Ill. App. 3d 93, 435 N.E.2d 761, which Continental also relies on, the court considered a situation similar to the one presented here. After a hearing, the hearing officer left the employ of an administrative agency before he issued a written recommendation. Another hearing officer issued a written recommendation based on his review of the record.

On appeal from the final order, the appellant argued it was denied due process because the agency's decision was made without the participation of the hearing officer who heard the testimony and could make credibility determinations. The appellate court rejected that argument and cited the supreme court's opinion in *Homefinders* (65 Ill. 2d 115, 357 N.E.2d 785), which recognized that, absent a statute to the contrary, administrative proceedings may be held by hearing officers who refer the case to the board for final decision although it did not hear the evidence in person. The court in *Homefinders*

stated that the requirements of due process are met if the decision-making board considers the evidence in the report of proceedings before the hearing officer and bases its determination on it. The court in *American Welding* noted that there was no due process requirement that the hearing officer prepare a written report. The court acknowledged that "if the evidence before a hearing officer or examiner is in such conflict that the weight and credibility to be given the testimony of various witnesses is the determining factor, due process may require that the examiner participate in the decision by submitting a report of his conclusions and impressions." (*American Welding*, 106 Ill. App. 3d at 98-99, 435 N.E.2d at 766.) Because credibility was not a determining factor in the case and there was no statute to the contrary, the court held that the issues could be decided without violating due process based on a review of the record without a report from the hearing officer who heard the testimony.

A contrary result in a similar case was required in *Quincy Country Club v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 497, 498 N.E.2d 316, because the enabling act required the hearing officer who heard the evidence to prepare the recommended disposition and required the board to adopt the officer's findings of fact if they were not contrary to the weight of the evidence. The court in *Quincy* specifically noted that the evidence in the case was disputed on "nearly every crucial element" and, therefore, "the ability to observe the witnesses' demeanor and assess their credibility was of paramount importance." (*Quincy*, 147 Ill. App. 3d at 500, 498 N.E.2d at 318.) Acknowledging that "[t]he constitution does not require that the ultimate decision-maker always hear the testimony relied upon for the decision," the court stated "[h]owever, where credibility is a determining factor in a case, we believe the presiding administrative law judge must participate in the decision." (*Quincy*, 147 Ill. App. 3d at 500, 498 N.E.2d at 318-19.) The court did not address the issue under a due process analysis.

Continental also relies on *Adams v. Industrial Comm'n* (1985), 147 Ariz. 418, 710 P.2d 1073, which involved a substituted administrative law judge who did not hear the testimony and rescinded the prior judge's award on a request for review. Because credibility was crucial in *Adams*, the court found that the rescission of the award was improper. The court did not consider a due process argument.

■ To resolve the issue in the present case, it is necessary to determine the extent to which credibility determinations played a role in the Commission's order. As the court in *American Welding* indicated, when credibility is a determining factor, due process may

require the hearing officer who heard the testimony to convey his findings to the decision-making board. Every case would involve credibility determinations to some extent; however, every case does not involve credibility disputes which affect the outcome of the case. Because the issue in this case was whether CSLP engaged in anti-competitive conduct, the Commission recognized the importance of determining motive which indicates the need for a credibility determination, but the Commission specifically found that credibility was not "a significant aspect of [the] case." Most of the evidence was documentary: the witnesses' direct and rebuttal testimony was submitted in written form and the parties introduced volumes of documentary evidence. The only live testimony presented was the cross-examination of five witnesses. As a result, any necessary credibility determinations could be made from reading the record. Also, the enabling act involved here, unlike the statute in *Quincy*, does not require the Commission to defer to the hearing officer's findings of fact. The Commission is the fact finder under the statute. (220 ILCS 5/10—110 (West 1992).) Further, similar to *American Welding* and unlike *Quincy*, the Commission did not rely significantly on credibility determinations, and therefore, it was not improper to issue an order without the findings of the hearing officer who heard the cross-examinations. As a result, there was no due process violation here.

## III

Continental also contends that the Commission's decision should be reversed because it was not supported by substantial evidence.

On appeal from an order of the Commission, the appellant bears the burden of proving that it was not supported by substantial evidence. (220 ILCS 5/10—201(d), (e)(iv) (West 1992).) This standard is not met by merely showing that the evidence may support a different conclusion; it must be shown that the opposite conclusion is clearly evident. *Cha v. City of Chicago* (1990), 194 Ill. App. 3d 213, 550 N.E.2d 1198.

As a preliminary matter, Continental argues that the Commission ignored certain evidence of CSLP's anti-competitive conduct. Continental presented evidence that it could not effectively compete with CSLP for its business plan customers when Continental's wholesale costs were essentially the same as the retail rate CSLP charged its customers. Also, Continental presented evidence that the number of CSLP's business plan customers increased significantly and, during the same time period, its reseller base was dwindling.

⊕5 Contrary to Continental's argument, a review of the Commission's order shows that it considered this evidence but for various

reasons, found that it did not establish CSLP acted with anti-competitive intent. For example, the Commission found that CSLP introduced its business plan to compete with Cellular One which was a rational business purpose as opposed to an intent to drive Continental out of the market. Also, although the number of CSLP's business plan customers had increased, the Commission was not persuaded that the business plan customers were the most desirable customers, as Continental asserted, and the Commission believed the evidence presented on that point was "inherently speculative."

■ In arguing that the Commission's order was not supported by substantial evidence, Continental disputes several of the Commission's findings. It contends that even if CSLP's business plan was a competitive response to Cellular One, CSLP was not entitled to deprive Continental of an adequate margin on that plan. However, the business plan was only one retail plan that CSLP offered and Continental's margin under the agreement was based on the weighted average of all CSLP's retail rates, including the business plan. As the Commission noted, Continental was not entitled as a reseller to a guarantee of a specific margin and the adequacy of a margin could not be determined on the basis of a single number. Instead, a detailed market analysis would be necessary but was not introduced into evidence. The Commission's interest in resellers is to verify that they have a legitimate opportunity to do business in the marketplace, but not to insure that they have a wholesale discount rate on every retail plan offered by the facilities-based providers. The evidence established that Continental had a legitimate opportunity to do business in the marketplace because it was making a profit and, during the relevant time period, it increased its customer base from 9,000 to 16,000. Although Continental argues that any evidence of its profit should not be considered in determining whether the margin was reasonable, that evidence was properly considered as a factor in deciding whether Continental had a legitimate opportunity to do business in the market based on the resale of service from either facilities-based carrier.

■ Continental also asserts that, contrary to the Commission's findings, the evidence showed CSLP's prices were at or below cost and, therefore, predatory. The Commission found that because Continental did not present any evidence of costs for either CSLP or Continental, the Commission could not determine whether CSLP set an unreasonable rate and was guilty of predatory pricing. Although Continental argues that it could not present such evidence because CSLP did not have any cost studies, it relies on the testimony of one witness from CSLP who stated that he was not aware of such studies. That witness also testified that CSLP priced its plans based on costs

and the market. Also, the Commission could not determine based on the evidence presented whether Continental could sell service to its retail customers at a lower rate than CSLP. Continental ignores that it, not CSLP, had the burden of proving its allegations.

■ Continental disputes the Commission's finding that CSLP did not engage in anti-competitive conduct because Continental and CSLP voluntarily entered into the agreement which established the blended wholesale rate. The option Continental chose under the agreement allowed CSLP to charge a blended rate which was based on the retail and discounted rates CSLP charged. Continental contends that the agreement did not negate a finding of anti-competitive intent and points to the fact that CSLP did not introduce the business plan until six months after they signed the agreement. However, the agreement did not prevent CSLP from introducing new retail plans and did not require it to provide Continental with a wholesale discount rate on any future retail plans. Although at the time of the agreement the discount business plan and the bundling plan had not yet been introduced, Continental's complaint in the circuit court, which requested a ruling that the agreement covered any discount plan that CSLP offered, was resolved against Continental. (*Continental Mobile Telephone Co.*, 225 Ill. App. 3d 317, 587 N.E.2d 626.) As a result, Continental cannot avoid the agreement covering CSLP's rates. Also, as the Commission noted, CSLP was not required under the Commission's regulations in the first instance to establish rates and terms of service through contracts with its resellers.

■ The heart of Continental's complaint is that CSLP set its retail rate for its discount plans, specifically its business plan, at such a low rate that Continental's margin was insufficient to effectively compete. In its order, the Commission identified several reasons for finding that Continental did not prove its complaint which are supported by the record. Primarily, Continental did not prove that CSLP acted with anti-competitive intent. There was no direct evidence of anti-competitive intent, but Continental may have prevailed if it showed that CSLP used superior market power and offered discount plans without a rational business purpose which could only be explained as an attempt to injure or destroy Continental. The evidence presented here showed that CSLP offered its discounted plans and bundled plans in response to and to compete with Cellular One. Although there was evidence that there may have been some animosity between Continental and CSLP because Continental opposed CSLP's request for deregulation and its rate increase, there was other evidence, specifically the competition with Cellular One, that shows

CSLP's actions were motivated by a rational business purpose. Based on our review of the record, the Commission's order was supported by substantial evidence.

Continental also notes that the successor hearing examiner made improper credibility determinations and cites to the examiner's memorandum to the Commission. However, the only decision which is being reviewed on appeal is the final order of the Commission (220 ILCS 5/10—201(a) (West 1992)), and any statements made in the memorandum are not relevant on appeal.

## IV

■ Continental also argues that the Commission erred when it retroactively applied an amendment to section 13—203 of the Universal Telephone Service Protection Law of 1985 (220 ILCS 5/13—203 (West 1992)) and found that Continental's requested remedy was not appropriate. The amendment to the section went into effect after Continental filed its complaint but before the Commission issued its final decision. The amendment provides that to the extent cellular service is excluded from active regulatory oversight, the Commission shall exclude all other providers in the State from active oversight where there are two or more providers in a geographic area. The Commission interpreted this language as requiring a "uniform regulatory environment." Any remedy provided to Continental, the Commission concluded, could affect the market and it would be unfair to require CSLP to change its practices without requiring Cellular One to also change its practices.

Apart from whether the amendment could be applied retroactively, the Commission acknowledged that its discussion on this point was not required based on its decision that there was no evidence of anti-competitive intent. Similarly, such a discussion is not necessary here based on our finding that the Commission's decision was supported by substantial evidence.

For the foregoing reasons, the order of the Illinois Commerce Commission is affirmed.

Affirmed.

CAHILL and THEIS, JJ., concur.