JAMES SERIO *et al.*, Petitioners-Appellants, v. POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Respondents-Appellees.

First District (4th Division)    No. 1—93—3174

Opinion filed August 31, 1995.—Rehearing denied September 27, 1995.

Law Offices of Joseph V. Roddy, of Chicago (Paul D. Geiger and Joseph V. Roddy, of counsel), for appellants.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Mardell Nereim, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE CAHILL delivered the opinion of the court:

Petitioners James Serio and Kathleen Moore appeal their discharge as Chicago police officers. The circuit court affirmed the decision of the Police Board of the City of Chicago (Police Board or Board) to discharge Serio and Moore. We affirm.

On the night of August 15, 1989, sometime after 10:30 p.m., Calvin McLin and Joseph Weaver were detained near White Sox Park by two white Chicago police officers for a curfew violation. McLin and Weaver were black male juveniles. The boys were directed to sit in the rear of the police car and then driven to 45th and Union Streets. The female officer sitting in the front passenger seat then let McLin and Weaver out of the police car and hit them. The officers then drove away. A group of white youths chased McLin and Weaver, caught McLin, and beat him. Weaver escaped. McLin was taken to a hospital where he was treated and released. McLin and Weaver went to the ninth district police station the next day, made a report, and a Chicago police department investigation followed.

The superintendent of the Chicago police department subsequently filed charges before the Chicago Police Board against Serio and Moore, alleging they violated seven department rules. The superintendent charged, in part, that on August 15, 1989, Moore and Serio "detained youths Calvin McLin and Joseph Weaver at or near 35th and Wallace, Chicago, Illinois, and transported them to 45th and Union after 10:30 p.m., and failed to process the youths as curfew violators, thereby failing to perform a duty and/or that as a direct result of their failing to process them as curfew violators, the two youths were the victims of racial harassment and McLin was the victim of a physical attack."

An evidentiary hearing followed.

Joseph Weaver and Calvin McLin testified that they went to a White Sox game on August 15, 1989. They left in the seventh inning, got change for bus fare, then sat down on a bench at the bus stop at 35th and Wallace. Two uniformed Chicago police officers in a marked police car pulled up to the bus stop.

The police officer in the passenger seat was a white female—tall, blond, and heavyset. McLin stated that she was about 6 feet tall. She asked the boys if they knew what time it was and told them to walk over and get in the car. She asked them their names, addresses, and phone numbers. She asked if they had any weapons and whether they had ever gotten their ass kicked by a fat white lady.

The police car had a plastic and mesh shield between the front and back seats. Weaver was seated behind the driver. He heard the driver say, "Let's take them to 48th, it's kind of rough around there." Weaver stated that the driver was male, had a strong voice, short blond hair, and a mustache. He was not wearing a hat. McLin stated that the driver was a white male with a husky deep voice, blond hair, a mustache, and fat face. They did not know where the police were driving them. The male driver told the female officer to hit the boys when she let them out of the car. She opened the back car door and hit McLin in the face and Weaver in the head with a closed fist as they got out of the car. McLin testified that he was 5 feet 6 inches tall and that the female officer was taller than he was.

Weaver and McLin began to walk along Union Street toward 43rd Street. The female officer told them they were going the wrong way. They turned and started to walk the other away. Six white males appeared, threw bottles, yelled, and chased them. Weaver ran. McLin was caught and beaten. Weaver was 14 years old. McLin was 15.

Weaver and McLin viewed a book of photographs of the officers assigned to the ninth district on August 16, 1989. The photographs are $2^{1}/_{2}$ by 3 inches. Weaver and McLin told the officer who showed them the photograph book that they did not want to pick a photograph of anybody because they could not be sure of the identification based on the photographs. Officers present told them to identify officers who looked similar to the two officers who picked them up the night before. Weaver picked Joseph Barra as the male police officer based upon his light colored hair. He picked Renetta Wiesniewski as the female. McLin selected the photographs of Daniel Albano as the male driver and Vita Baronaitis as the female passenger.

Weaver and McLin both asked to see a lineup. They viewed a lineup on August 16, 1989, and each identified petitioner Moore as

the female. They had no doubt about the identifications. Wiesniewski and Baronaitis were not in the lineup. Weaver and McLin also viewed a lineup of male police officers, but identified no one.

Weaver and McLin viewed another lineup at the State's Attorney's office on October 11, 1989, and each again identified Moore. Officers Baronaitis and Wiesniewski were present in this lineup. Weaver was sure about his identification. McLin admitted that when he testified at the criminal trial arising out of this case, he said that he was not positive when he identified Moore at the State's Attorney's lineup on October 11, 1989. McLin also testified that, a few days before the criminal trial, he identified Gail O'Connor from a photograph as the female officer. Weaver testified that Moore does not look like her photograph in the police photograph book. Weaver and McLin identified Moore at the hearing.

Lisa McFarlane testified that she was with her friend Dolores Barrett in front of a store at the corner of 45th and Union Streets on the night of April 15, 1989. She saw a police car pull up and stop. A uniformed female officer sitting in the front passenger seat stepped out of the car and let two black boys out of the car. The female officer was not wearing a hat. McFarlane described the officer as a heavyset, tall, white woman with blond hair. The officer slapped each boy on the head with her closed fist as they got out of the car. McFarlane did not see the driver of the police car. McFarlane was not able to identify the female officer from photographs.

McFarlane and Barrett told the boys not to walk toward the park because a group of white "neighborhood kids" were playing basketball in the park. The two boys walked away from the park but were chased by the group of white males.

Dolores Barrett also was unable to see the driver of the police car. She described the boys as small. She stated that the female officer was 6 feet tall, heavy, and blond. Barrett had a clear, lighted view of her from about 30 feet away and got a good look at her face. Barrett made a photo identification of Moore at the police station a week after the incident and picked her out of a lineup held by the State's Attorney at 26th and California Streets on October 11, 1989. She had no doubt as to these identifications. Barrett stated that the officer who slapped the boys had lighter colored hair than Moore's both in her photograph and at the lineup.

Commander Frank Radke of the ninth district police station testified that he was granted permission to investigate this case on August 16, 1989. Radke stated that a police car with a plastic and mesh partition between the front and back seats is called a cage car.

Three teams of male and female officers were assigned to drive

cage cars in the ninth district on August 15, 1989, between 10 p.m. and 11 p.m. Serio and Moore were in one car. James Williamson and Vita Baronaitis were in another car, but were on compensatory time from 8:30 p.m. to 11:30 p.m. The officers in the third car were black. Radke testified that an additional cage car was assigned out between 10 p.m. and 11 p.m. on August 15, 1989. Two female officers, Renetta Wiesniewski and Gail O'Connor, were in that car. Radke testified that it was unusual to see a police car from a different district enter the ninth district, although police officers are allowed to go into other districts to transport arrestees from one area to another. Radke stated that he was present when Weaver and McLin identified Moore in the lineup held on August 16, 1989.

Officer Renetta Wiesniewski testified that she was assigned to a cage car in the ninth district on August 15, 1989. Her partner was Officer Gail O'Connor. Wiesniewski drove because O'Connor was a recruit and unfamiliar with the streets. Wiesniewski testified that she and O'Connor drove to 31st and Morgan after 10 p.m. to transport two arrestees to the ninth district station. When they arrived, they saw Officer Veronica Samanas. Wiesniewski and O'Connor then transported the two arrestees, Zastro and Petrick, to the ninth district between 10:25 p.m. and 10:35 p.m. Wiesniewski stayed at the station until she went home at 10:55 p.m. O'Connor stayed to complete reports.

Counsel for Serio and Moore asked Wiesniewski about a report completed by O'Connor which showed that Wiesniewski responded to a call at 5159 South Whipple Street at 10:40 p.m. on August 15, 1989. Wiesniewski explained that the time referred to the writing of the report, not the time of the occurrence. Wiesniewski said she never answered the Whipple Street call, but O'Connor might have answered the call the day before when she and O'Connor were not working together. Wiesniewski is 5 feet 5 inches tall. O'Connor is 5 feet 3 inches tall. Wiesniewski is a natural blond. She further stated that Moore's hair color was "auburn" on August 15, 1989, and that Moore frequently changed her hair color. She said that Moore's hair color is darker than it appears in the police photographs, but she has also seen Moore with "highlights."

Officer O'Connor testified in substance that she was at the ninth district station on August 15, 1989, from 10:30 p.m. to 11 p.m. and that her Whipple Street report referred to the night before.

Lisa Bonilla testified that she lived at 5159 South Whipple on August 15, 1989. She called the police after 9 p.m., but also stated that she did not remember if the date of the occurrence was August 15, 1989.

Edward Finn testified that he conducted a lineup at the State's Attorney's office on October 11, 1989. Finn was present when Dolores Barrett viewed the lineup. He described Barrett's identification of Moore as "tentative."

Officer James Newton testified that he was assigned to the lockup in the ninth district on August 15, 1989. He filled out a report that prisoner Michael Zastro entered the lockup at 11:16 p.m. on August 15, 1989.

Officer Veronica Samanas testified that she and her partner called for a transportation vehicle after they arrested Zastro and Petrick at 330 South Morgan at 10 p.m. on August 15, 1989. Wiesniewski and O'Connor responded to the call. Samanas testified that O'Connor was the driver and Wiesniewski was the passenger. Samanas saw Wiesniewski at the station sometime around 10:30 p.m. She testified that Serio and Moore arrived at the station between 10:40 p.m. and 10:45 p.m. She stated that Moore remained until after 11 p.m. Samanas said the color of Moore's hair was "light brown." Samanas has been "good friends" with Moore since 1987 and talks to her a couple of times a week.

Moore and Serio testified they had no contact with Weaver or McLin on August 15, 1989. They were on duty, in uniform, and working together in a cage car that night. Serio drove, and Moore was the passenger. Moore stated she is 5 feet 11½ inches tall. Moore called the station dispatcher to say she and Serio were going to lunch at 9:50 p.m. They ate at a restaurant on the corner of Archer and Hoyne. Moore called clear from lunch at 10:39 p.m. The dispatcher told them to come to the station for repair service. Serio and Moore testified that they left the restaurant after they called clear from lunch. It took three minutes to drive to the station. They parked the car at 35th and Lowe, a half block from 35th and Wallace. Serio and Moore stated that they entered the station and waited for repair service until 11 p.m., but the service truck never showed up.

Officer Michael Jeziorny testified that he saw Serio and Moore in the restaurant. He stated that they stayed in the restaurant and talked to him for 5 or 10 minutes after they called clear from lunch.

Serio and Moore were called to testify a second time. The second time Serio and Moore stated that they stayed at the restaurant for 10 minutes talking to Officer Jeziorny after they called clear from lunch. Serio said that it would take less than 10 minutes to drive from 35th and Wallace to 45th and Union and then back to the ninth district police station.

The Police Board found Serio and Moore guilty of the charges and ordered their termination as police officers.

Serio and Moore filed a complaint for administrative review in the circuit court. The circuit court found evidence in the record sufficient to support the findings of the Board. The court determined that "it cannot be said from a review of this record that an opposite conclusion is clearly evident from the record. Indeed, the findings of the Police Board are supported by the preponderance of the evidence." The court also held that the Board properly determined that there was sufficient cause for discharge. This appeal followed.

Serio and Moore argue that the Police Board denied them due process because there is no evidence in the record that the hearing officer participated in the decision or gave his conclusions and impressions of the testimony to the Board.

■ The petitioners assert that "there is no doubt that the hearing officer took no part in the decision of the police board." We disagree. The record shows that a written report containing factual and credibility findings for Serio and Moore was prepared after the hearing. The report for each officer is entitled "Findings & Decision" and states: "Following the hearing, the members of the Police Board read and reviewed the certified transcription of the proceedings of the hearing and all exhibits submitted into evidence. Michael G. Berland, Hearing Officer, made an oral report and conferred with the Police Board before it rendered a decision." The report of findings concludes with the words "Respectfully submitted." Below that phrase appears the signature of the hearing officer, Michael Berland. The following page is entitled "Decision." It states: "The members of the Police Board, having read and reviewed the certified copy of the transcription of the hearing, having received the oral report of the Hearing Officer, Michael G. Berland, and having conferred with the Hearing Officer, hereby adopts all findings." The statement is signed by five members of the Police Board and the Board's executive director.

A hearing officer appointed by the Police Board is authorized to conduct an evidentiary hearing in place of Board members. (65 ILCS 5/10—1—18.1 (West 1992); Chicago Municipal Code § 2—84—030 (1992).) The hearing officer here presided over four days of testimony. Administrative proceedings may be conducted by a hearing officer who refers the case for final determination to a decision-making body which has not heard the evidence in person. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 128-29, 357 N.E.2d 785.) In *Homefinders*, the supreme court held that, absent a statute to the contrary, due process is satisfied "if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determinations thereon. [Citations.]" *Homefinders*, 65 Ill. 2d at 128-29.

Serio and Moore rely on *Southern Illinois Asphalt Co. v. Environmental Protection Agency* (1973), 15 Ill. App. 3d 66, 303 N.E.2d 606, to support their argument that when weight and credibility is to be given to testimony of witnesses, the litigants are entitled to have the person who conducts the hearing and sees the witnesses report his conclusions and impressions by written or oral report to the fact-finding body. The court in *Southern Illinois* did not determine whether a hearing officer is required to submit its findings of fact to the decision-making agency in order to comply with due process. Rather, the court recommended that "it would be better practice for the Board to require in the future that a hearing officer submit findings of fact to it." *Southern Illinois*, 15 Ill. App. 3d at 81.

Our supreme court has not addressed whether due process requires the hearing officer to submit findings of fact to the decision-making agency. But, the court in *American Welding Supply Co. v. Department of Revenue* (1982), 106 Ill. App. 3d 93, 435 N.E.2d 761, stated, "if the evidence before a hearing officer or examiner is in such conflict that the weight and credibility to be given the testimony of various witnesses is the determining factor, due process may require that the examiner participate in the decision by submitting a report of his conclusions and impression." (*American Welding*, 106 Ill. App. 3d at 98-99.) Here, the requirements for procedural due process were met. The record shows that the Board read the transcript of proceedings, considered the evidence, and based its decision on the evidence in the transcript. The hearing officer made an oral report and conferred with the Board before a decision was reached.

We address whether this court on review should apply the usual deference to the Board's findings on questions of fact. (See *Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 372, 498 N.E.2d 1145 (police board's findings of fact held *prima facie* true and correct).) Deference on review is based on the established rule that the person who presides over the case and sees and hears the witnesses is in the best position to weigh and judge the credibility of the testimony. See *Calvert v. Carpenter* (1880), 96 Ill. 63, 67.

We recognize that where final administrative decisions are made by agency boards, the boards need not personally observe the witnesses. Police Board procedures further allow the Board to accept oral recommendations from a hearing officer. Although this procedure does not violate due process (see *Starnawski v. License Appeal Comm'n* (1981), 101 Ill. App. 3d 1050, 1053-54, 428 N.E.2d 1102), it may fail to establish an adequate record to review credibility findings. A reviewing court may be deprived of the opportunity to determine whether or not the hearing officer communicated findings

of credibility to the Board if an adequate record is not made. As Serio and Moore point out, the recited statement that "the hearing officer made an oral report and conferred with the Board" does not show whether the hearing officer made credibility determinations and, if he did, whether the Board accepted or rejected those determinations.

An agency is free to make its own decision based on the evidence in the record and may accept or reject the hearing officer's recommendations. (*Ramos v. Local Liquor Control Comm'n* (1978), 67 Ill. App. 3d 340, 384 N.E.2d 912.) But, a hearing officer's findings, where demeanor is important, is an element to consider in reviewing whether substantial evidence supports the agency's decision. (*Universal Camera Corp. v. National Labor Relations Board* (1951), 340 U.S. 474, 492-97, 95 L. Ed. 456, 469-72, 71 S. Ct. 456, 466-69.) This court held in *Quincy Country Club v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 497, 500, 498 N.E.2d 316, "where credibility is a determining factor in a case, we believe the presiding administrative law judge must participate in the decision." The court in *Quincy* noted that the evidence in the case was disputed on "nearly every crucial element" and, therefore, "the ability to observe the witnesses' demeanor and assess their credibility was of paramount importance." *Quincy*, 147 Ill. App. 3d at 500.

■ We believe it is reasonable to infer that the report of findings of the hearing officer includes his factual and credibility determinations. The Board expressly adopted these findings in its decision. We further believe that this case, unlike *Quincy*, does not turn on the credibility of the witnesses. As this court noted in *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n* (1994), 269 Ill. App. 3d 161, 171, 645 N.E.2d 516, "every case does not involve credibility disputes which affect the outcome of the case."

Here, a compelling array of facts that are not undermined by questions of witness credibility support the Board's decision that Serio and Moore are guilty by a preponderance of the evidence.

Weaver and McLin were picked up in the ninth district by two uniformed white police officers on August 15, 1989, after 10:30 p.m. The officers drove a police cage car. These facts are not disputed.

Evidence was presented regarding four cage cars assigned to the ninth district on the night of August 15, 1989. The officers in one car were on compensatory time. The officers in the second car were both black. The officers in the third car were both female: Wiesniewski and O'Connor. Wiesniewski is 5 feet 5 inches tall. O'Connor is 5 feet 3 inches tall. McLin stated that the female passenger officer was taller than he was. McLin was 5 feet 6 inches tall. Serio and Moore attempted to make an issue about whether Wiesniewski and

O'Connor responded to Lisa Bonilla's call on August 15, 1989, or whether O'Connor responded to the call on August 14, 1989. The Board pointed out, under either version, Wiesniewski and O'Connor were accounted for during the time of the incident at issue in this case. That leaves Serio and Moore, or a cage car from outside the district.

Weaver and McLin said the driver of the car had a mustache. The photograph in evidence taken of Serio on August 16, 1989, shows he had a mustache. Weaver and McLin identified Moore on August 16, 1989, October 11, 1989, and in court as the female passenger officer. Barrett, an eyewitness with no connection to anyone involved in the incident, positively identified Moore a week after the incident and on October 11, 1989. Barrett stated that the female passenger officer was about 6 feet tall. Moore is 5 feet 11$^1$/$_2$ inches tall. Officer Samanas testified that Serio and Moore arrived at the station at 10:40 p.m. or 10:45 p.m. But, Officer Jeziorny testified that Serio and Moore stayed at the restaurant talking with him for 5 or 10 minutes after 10:39 p.m. The first time Serio and Moore testified in this case, they stated they left the restaurant after they called clear from lunch at 10:39 p.m. and arrived at the station three minutes later. The second time they took the stand, each said they stayed at the restaurant for 5 or 10 minutes after 10:39 p.m. Serio admitted that within this 10-minute discrepancy, they could have driven from 35th and Wallace to 45th and Union and back to the ninth district station.

We conclude that the Board correctly found that the findings supported the discharge of Serio and Moore from the Chicago police department. We will not reverse the Police Board's decision that cause for discharge exists unless it is arbitrary, unreasonable, or unrelated to the requirements of service. (*Allman v. Police Board* (1986), 140 Ill. App. 3d 1038, 489 N.E.2d 929.) This court has defined cause for discharge as a substantial shortcoming which renders an employee's continuance in office detrimental to the discipline and efficiency of the service and which the law and public opinion recognize as good cause for dismissal. (*Kreiser v. Police Board* (1976), 40 Ill. App. 3d 436, 352 N.E.2d 389.) The Board found and the record supports that Serio and Moore picked up Weaver and McLin, mocked them, hit them, and dropped them off in an area they knew was dangerous. This conduct undermines the police department and its ability to enforce the law. The Board's decision to discharge Serio and Moore was reasonable and related to the police department's need to maintain the confidence of the public.

■ Serio and Moore also argue that the doctrine of judicial estoppel requires reversal of the Board's decision. They claim that the city

should be judicially estopped from prosecuting charges against them because in the civil suit filed against the city by McLin and Weaver, the city answered the complaint that it "lacks knowledge and information sufficient to form a belief as to the truth of" certain factual allegations.

Judicial estoppel prevents a party from maintaining inconsistent positions in separate judicial proceedings. (*Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 433 N.E.2d 1112.) We believe that filing administrative charges is not inconsistent with admitting uncertainty about underlying facts before discovery in a civil action.

Affirmed.

HOFFMAN, P.J., and THEIS, J., concur.