Joseph HEARNE, Linda Daley, Andrew Hoffman, and the Chicago Teachers Union, an unincorporated labor association, Plaintiffs,

v.

BOARD OF EDUCATION OF THE CITY OF CHICAGO, a body politic and corporate, Illinois Educational Labor Relations Board, an agency of the State of Illinois, the State of Illinois, and Jim Edgar, Defendants.

No. 97 C 3345.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 29, 1998.

Gregory Nathan Freerksen, James Brian Dykehouse, Witwer, Poltrock & Giampietro, Chicago, IL, for Plaintiffs.

Thomas A. Ioppolo, Daniel Frank Lanciloti, Illinois Atty. General's Office, Chicago, IL, for Defendants.

Miguel Angel Rodriguez, City of Chicago Board of Education, Chicago, IL, Marilyn F Johnson, Chicago Board of Education, Chicago, IL, Robert Raymond Hall, Jr. Chicago Board of Education, Chicago, IL, for Chicago School Reform Board of Trustees, movant.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

In 1995, shortly before the end of the legislative session in Springfield, the General Assembly passed a school reform package of laws. The Governor signed the Act into law on the same day it was passed. The Act applies only to the Chicago Public Schools because the General Assembly found "an education crisis exists in the Chicago Public Schools" and it altered existing conditions of the relationship between management and labor.

The Chicago Public Schools have been operating under laws applicable only to them for several decades under Article 34 of the Illinois School Code. The Illinois laws are replete with statutes made applicable or inapplicable to cities with more then 500,000 inhabitants [1] of which there is only one in Illinois. Many of these statutes govern the status of employees such as those which provide separate pension schemes for Chicago police officers (40 ILCS 5/5–101–5/236) and Chicago firefighters (40 ILCS 5/6–101–6/226) and those which exclude Chicago police and firefighters (largely) from the Workers' Compensation Act (820 ILCS 305/1(b)(1), 8(c)). There is a separate Labor Relations Board for employees of Chicago and Cook County (5 ILCS 3/5/1 et seq.).

The laws that govern Chicago schools were amended in a variety of ways. For example, one provision was amended to permit a School Reform Board to outsource work done by employees and lay the employees off (105 ILCS 5/34–18 (30)). Non-educational employees can be discharged without cause (105 ILCS 5/34–15). Teachers and principals can be terminated only for cause but the Board (rather than an independent hearing officer) makes the final decision whether cause exists (105 ILCS 5/34–85). The board hires, fires and lays off; principals can administer all other discipline of all employees at their schools (105 ILCS 5/34–8.1). The Reform Board can intervene in under-performing schools and such intervention may result in summary reassignments, layoffs or dismissals (105 ILCS 5/34–8.4). The General Assembly also amended the collective bargaining law which governs educational employees

---

1. So, too, there are statutes that include or exempt counties of more than 1,000,000 inhabitants of which there is only one in Illinois or more than 500,000 of which there are currently two. A Westlaw search of Illinois statutes yielded 180 sections of law that make distinctions based on whether a county has more than 500,000 inhabitants, including laws on fire protection and county extension education funding and at least 15 sections of law containing distinctions based on whether a county has 1,000,000 inhabitants, including laws pertaining to the power of county supervisors, procedures for county recorders, and mosquito extermination. Another Westlaw search yielded 43 sections of law that make distinctions based on whether a city has 500,000 inhabitants, including, for example, laws pertaining to political nominations, pension funds and the financing of sanitary districts.

by prohibiting collective bargaining over certain subjects. In part, this amendment precludes the Union from nullifying the effect of the Article 34 amendments by demanding that the Reform Board surrender them in a collective bargaining agreement.[2] (115 ILCS 5/4.5, a section of the Illinois Educational Labor Relations Act).

The employees and their unions challenge the constitutionality of these laws. I have previously rejected a similar (but not identical) challenge by non-educational employees in *Bricklayers Union Local 21 v. Edgar*, 922 F.Supp. 100 (N.D.Ill.1996).

The plaintiffs here are the Chicago Teachers Union and one teacher, Joseph Hearne who was fired for cause under the new law. Also plaintiffs are two non-educational personnel, Linda Daley and Andrew Hoffman who could have been fired without cause but were, it is undisputed, fired for cause pursuant to the Reform Board's own policy and a collective bargaining agreement.

At the threshold are a question of abstention in the case of one plaintiff, ripeness in the case of two others and the immunity of the State defendants.

The gravamen of the complaint is that the individual plaintiffs are all African–American, as are a majority of the members of the Union, and that the legislative amendments to the school laws were racially and politically motivated. In support, plaintiffs allege that the non-educational personnel employed by the Board are 83.3% women or racial or ethnic minorities. Moreover, the Union has for many years worked for and contributed to the election of Democratic candidates for state office and opposed the election of the current Governor and Republican members of the General Assembly. From these facts the plaintiffs allege that the amendments to the school law were motivated by impermissible racial and political animus. There are no cited statements from the legislative record to support either the racial or political motivations of the legislators, and there is no evidence that the Democratic administration of the city government regards the amendments as acts of political hostility. The theory of the complaint rests purely on disparate impact.

■■■ None of the state agencies belong in the case. Neither the State, nor its Governor, nor the Illinois Educational Labor Relations Board ("IELRB") can be sued for damages under the Eleventh Amendment.[3] The Governor and the Board might be amenable to injunctive or declaratory relief but neither is a proper defendant in a suit for damages. The Governor has no role in the enforcement of the new laws. He is not alleged to have performed any act other than signing legislation, and, in the unthinkable event that it lay within my power to enjoin him from doing so, it is too late for that relief. *See Weinstein v. Edgar*, 826 F.Supp. 1165 (N.D.Ill.1993). Plaintiffs do not allege that the IELRB has taken or is about to take any action adverse to any plaintiff. So, there is nothing to enjoin. This leaves only the Title VII claim. Congress has waived sovereign immunity where the state is sued as an employer. But the State of Illinois is not an employer. The Reform Board is the employer. Every allegation of the complaint makes that clear. There is a case that accepts the possibility that a person could so deeply control an employment relationship that he or she could be deemed to be an employer as a hospital may by precluding a nurse from working for a particular patient. But the case that recognized this possibility also held that "teachers were not employed by the state, but by local school districts" despite the fact that "Illinois exerts more control over public school teachers than over any private employees in the state and probably over any other persons formally employed by local governments in the state." *E.E.O.C. v. State of Illinois*, 69 F.3d 167, 168, 171 (7th Cir.1995). The state defendants are dismissed.

---

2. There can be no bargaining over the grant of charter school proposals, outsourcing, lack of work or funds type layoffs among other things.

3. The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

■ The claim of plaintiff Hearne is one on which I ought to and do abstain. Hearne was accused of acts which constitute cause for discharge. He sought state judicial review and won on the grounds that it is a violation of due process (at least in his particular case) to permit the Board rather than the independent hearing officer to make the final decision to fire him. This decision by Judge Canard of the Circuit Court is being appealed. It is true that Judge Canard rejected all of Hearne's other arguments that strict scrutiny of the legislation is required, that, even if it is not, that there is no rational basis for the legislation, and that racial animus has been adequately plead. The fact remains that if Hearne is able to hold on to his judgment in state court, there is no need for me to decide any of his claims. All that Hearne can complain of losing is his final decision from a hearing officer and that question is before the state court whose proceedings are well along. Presumably Hearne may even seek to sustain his rejected theories on appeal. I abstain under both *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Colorado River Water Conservation District v. U.S.*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). I dismiss under *Younger* because to take the case would be to interfere with the state judicial process of disciplinary termination.

This leaves only the claims of Hoffman and Daley: they dispute the absence of a binding decision by an independent hearing officer. It is clear that some aspects of the new law are not in dispute here, at least because plaintiffs have no standing to challenge them and the complaint does not appear to challenge them in this case. The outsourcing and layoff authority, the intervention authority and the principal's authority did not play a role in the terminations of Daley and Hoffman. So we are down to the issue of the independent hearing officer. This is also true with respect to the Teachers Union which seeks to vindicate the right of its members to have a binding decision rendered by an independent hearing officer and presumably its right to bargain with the Board for the same.

■ This right to bargain is not, on its face, foreclosed by the new law so the Union has no obvious complaint in this regard. Even if the Union did have some claims to limitations on its bargaining rights, it went ahead and concluded a contract with the Board rather than challenge the law. It is true that some job security aspects are no longer subjects of bargaining, but the independent hearing officer issue is not one of them. To test this provision, the Union should have tried to bargain and filed unfair labor practice claims if the Board refused to negotiate. For reasons which may well have been quite prudent the Union decided that it was best to conclude the agreement rather than go through proceedings before the IELRB (which could not hear its constitutional challenges but could construe the law) and then go the Illinois Appellate Court which could both construe the law and pass upon its constitutionality. This sort of choice is difficult to make, but, once made, one is stuck with its consequences. The consequences here are that the Union claims are not ripe. The Union says, and they may well be right, that the pursuit of their objections in the state administrative and judicial process (as opposed to concluding an agreement) would have run the very serious risk of disrupting the orderly opening of schools. This means, however, that the Union will have to wait for another day to make its case, a day when we can say precisely what is or is not excluded from bargaining under state law.

■ On the remaining merits of the complaint, I note there is no federal due process right to have a binding decision rendered by an independent hearing officer rather than the Reform Board. Under the present law there is a hearing officer who rules on evidence, oversees the making of a record and makes findings of fact and a recommendation. The fact that the Board does not have to accept what the hearing officer says is not in violation of the Constitution. No case is cited to me that so holds, and this is because the pattern of hearing officer recommendation and board decision making is a common and accepted structure in both federal and state practice. *See Serio v. Police Board*, 275 Ill.App.3d 259, 211 Ill.Dec. 622, 655 N.E.2d 1005 (1995) (Police Boards); 29

U.S.C. § 160(c) (National Labor Relations Board); 33 U.S.C. § 921(b)(3) (Benefits Review Board). *See generally United States v. Raddatz,* 447 U.S. 667, 680–81, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). That the procedure may be abused in some cases is a matter to be raised when abuse does occur and no such abuse is alleged here. The fact that the Board's personnel may initiate the changes which the Board decides does not violate a federal constitutional right. *Withrow v. Larkin,* 421 U.S. 35, 54–58, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Lamb v. Panhandle Community Unit School Dist. No. 2,* 826 F.2d 526, 529–30 (7th Cir.1987).

■ To the extent the state law conferred a property right in a different procedure, the state had the right to remove it prospectively as I held in *Bricklayers Union,* 922 F.Supp. at 107. The legislative process is due process. *See also Pittman v. Chicago Board of Education,* 64 F.3d 1098 (7th Cir.1995) The plaintiffs, understanding this, attack the legislative process as unlawfully motivated and, if not, then improperly designed.

Plaintiffs also offer a variety of equal protection and due process arguments and demand strict scrutiny of the legislative action. Many of their arguments were considered and rejected by me in *Bricklayers,* and I adhere to the views expressed there. They offer two newer basic propositions: there was bad legislative faith and the legislature could not make legislation applicable only to Chicago.[4]

■ Assuming that strict scrutiny is not required, there is a perfectly obvious and rational basis for singling out Chicago even if other school districts have worse test scores or more problems than Chicago. The Chicago Public School system is so large in comparison to any other public school district in Illinois that it can rightly be thought of as an ocean liner while the others are small yachts. The ocean liner is, proverbially, hard to turn around and the yacht is not. Extraordinary measures may be required for the Chicago schools, at least the General Assembly could rationally believe this is so. Rules which apply to specific geographical areas, like high population centers, are not suspect for that reason alone. *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 462, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). Moreover, the measures which are applied to Chicago schools may well be applied eventually to other schools. The legislature can pick a place to start reforms to see how they work before spreading them to other troubled school districts. *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

The claim for strict scrutiny is founded on the bad motives of the legislature. Few statutes, if any, survive strict scrutiny, and, if the plaintiffs are entitled to have the school laws strictly scrutinized, they certainly survive this motion to dismiss. It is getting to strict scrutiny that is difficult.

■ Plaintiffs state their case in this way: [T]he ... legislature (dominated by white suburban and downstate Republicans) ... created two systems of employment security for ... school employees, one ... for Chicago employees (who are overwhelmingly African American and minority) and another

---

4. In the text, I address the critical claims in the complaint. There are others which I note here. The 42 U.S.C. § 1983 claim fails if there is no denial of a constitutional right. The 42 U.S.C. § 1981 claim fails if intentional discrimination has not been alleged properly. The 42 U.S.C. § 1982 claim fails if there is no real or personal property which can be held by plaintiffs. Damages are out of the case because of the Reform Board's immunity since there is no claim that it has not followed a state law in good faith. The Reform Board might be liable for damages as an employer but it is not alleged to have terminated anyone for discriminatory reasons. The closest there is to such an allegation is that terminations which have occurred have overwhelmingly been against minority employees. This is not an adequate allegation in the context of this case. There is a clear allegation of racial animus in the General Assembly. There is no such allegation regarding the Reform Board. There is no allegation that the percentages of minority terminations have significantly increased since passage of the legislation. Since the allegation is that the employees are generally members of a minority, it is not surprising that the majority of terminations are minority individuals. The only employment practice at issue in this case that could be responsible for discrimination is the removal of decision making power from hearing officers. This practice is not identified as the accused employment practice and there is no way to infer that it made a difference.

system for suburban and downstate public school employees (who are overwhelmingly white). This ... provides generous benefits to the constituents of the white suburban and downstate Republicans, while at the same time offering little or no job security to the predominantly black employees in Chicago.... The ... legislation denied Chicago ... employees the right [to have or to bargain for an independent hearing officer as others do]...

[T]hose legislators and the Governor were Republican ... and ... had been opposed politically by the ... Chicago Teachers Union ... [whose] members are predominantly Democrat ... and the ... Union has politically supported the Democratic candidates in opposition to the suburban and downstate Republicans who ... [took] over both houses of the Illinois General Assembly.... The ... Union ... had been a significant source of funds of the campaigns of the opponents of suburban and downstate Republicans.

The plaintiffs conclude on the basis of these facts that the legislation was passed for an explicitly racially discriminatory purpose and was specifically intended to punish the Union for its political opposition.

The theory does not work on either racial or political grounds.

There are no applicable precedents for the racial claim. The only cited case is a three judge District Court opinion in *Alabama State Teachers Ass'n v. Lowndes County Bd. of Educ.,* 289 F.Supp. 300 (N.D.Ala.1968). At question there were eight separate statutes each of which exempted a single county from laws giving tenure to teachers. All of these counties were in the so-called Black Belt of Alabama. There was no denial by defendants that the statutes were based on racial considerations. Moreover there was a long history of *de jure* segregation in Alabama and there was an equally long history of court orders striking down Alabama statutes on racial grounds particularly in educational matters. The District Court cited and relied upon that history. There were apparently no neutral grounds offered by the Alabama Legislature to support the legislation. The precedent is of no value to plaintiffs in this case.

■ The statistical disparity which lies at the heart of both racial and political claims seems insufficient in light of *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), which rejected a challenge to state welfare benefit computation procedures that disproportionately impacted AFDC recipients as compared to old-age/disability recipients. The practical effect of this was a disparate impact on African–Americans and Mexican–Americans. The court in *Jefferson* applied rational basis analysis and not strict scrutiny. *See* 406 U.S. at 546–49. Racially disparate impact does not establish discrimination. To make a case one needs intent. *See Tucker v. U.S. Dept. Of Commerce,* 958 F.2d 1411, 1413–14 (7th Cir.1992).

■ There is a conclusory claim that such racial intent existed here, but it is not alleged to exist in any one of the named defendants. Only the legislature is alleged to have had a wrongful racial purpose. Courts do not ordinarily determine the constitutionality of legislation based upon the intent of the legislature. Usually this is so because the only way to prove the claim is to depose the legislators. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). There are cases in which legislative motives are examined. The legislative redistributing cases come to mind although most of them arise from states with long histories of *de jure* segregation whose districting must go through preclearance by the Department of Justice. This process itself creates an evidentiary record of legislative intent. In *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), racial motivation was adequately alleged when Georgia redistricted. The basis for the allegation was the history of the legislation. Georgia started with a plan that had two majority-minority districts. The United States refused to approve the plan twice and the Department of Justice specifically mentioned better plans which had three such districts. On the third attempt, Georgia went for one of the plans praised by the

Justice Department. Statements in the legislative record showed the purpose of the redistricting was predominantly based on considerations of race. One of the districts was so geographically irregular, the only explanation for it was racial gerrymandering. There was further evidence of this in the legislative record. The Court noted "until a claimant makes a showing sufficient to support that allegation [of race-based decision making] the good faith of a state legislature must be presumed.... The plaintiff ... [must] show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision...." *Id.* at 915–16.

 Applying the lessons of the Supreme Court's redistricting cases, I conclude that, in Illinois, a legislative decision to enact a law applicable only to Chicago gives rise to no inference of improper purpose. The long-standing and rational practice in Illinois to make special provision for Chicago negates this inference. *See Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 549–51, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (proper to subsidize lobbying by veterans' groups but not by other tax exempts). Chicago has been Illinois' largest urban center for more than a century. It is not a newly created electoral district that resembles a "sacred Mayan bird." *See Bush v. Vera,* 517 U.S. 952, 974, 116 S.Ct. 1941, 1959, 135 L.Ed.2d 248. Employees of Chicago and its agencies are not a suspect class under *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). There is no legislative record to support an inference of racial motivation. There is only the legislation itself and its disparate impact. This is not a good enough reason to permit inquiring into the motives of legislation. The plaintiff might be able to overcome these deficiencies if he alleged a pattern of racially discriminating action as was the case in *Alabama State Teachers Association.* It is impossible to make a pattern out of a signal piece of legislation.

This case is not *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), or any of its progeny.

 The same analysis applies to the political retaliation claim. The only defendant who is alleged to have such a political intent is the Governor who is immune from damages and against whom there is no cause for injunction. The legislation here does not retaliate against a particular individual as did the executive acts in *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995) (a specific liquor dealer was treated worse than other liquor dealers in Naperville because he opposed the Mayor). There is no fact upon which to base a conclusion that one can disregard the presumption that the legislature acted in good faith.[5] On the basis of the facts alleged, the Republican view on public school policy prevailed over the Democratic view. Whenever one political party's particular policy is enacted into law one could always find among the adversely affected those who supported the other party; indeed, even those who supported the other party precisely because they did not want the particular policy. The argument the plaintiffs offer is crazy. If the Democrats assume control of the legislative process and change the law, say, to preclude outsourcing, would the plaintiffs say that third-party contractors could overturn the legislation (or even maintain a lawsuit) by claiming the Democrats passed the law because they, the third-party contractors, are Republicans and had given money to Republican opponents of Democratic legislators?

There is no reason to believe that what occurred here is other than the normal political process. The policies of political opponents are enacted into law because the political opponents were elected. The remedy is to go to the ballot box, not to the courthouse.

---

5. There is not even an allegation that Democrats in the legislature or Democrats in general uni-

formly opposed the legislation.