FIFTH DIVISION

AUGUST 4, 1999

NUNC
 
PRO
 
TUNC
 JUNE 6, 1999

1-98-0775

PAUL RUTHER, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )

)

TERRY G. HILLARD; Superintendent ) 

of Police; THE CITY OF CHICAGO, a )

Municipal Corporation; THE POLICE ) 

BOARD OF THE CITY OF CHICAGO; THE )

CHICAGO POLICE DEPARTMENT; ART SMITH; ) 

WILLIE UPSHIRE; JAMES MURRAY; WILLIAM )

KIRKLING; RUSSELL EWERT; PHYLLIS )

APELBAUM; VICTOR ARMEDARIZ; )

SCOTT DAVIS and DEMETRIUS CARNEY, ) Honorable

) Aaron Jaffee,

Defendants-Appellants. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

Following an administrative hearing, the Police Board of the City of Chicago (Board) discharged petitioner Paul Ruther from the Chicago Police Department (Department) for violating certain departmental rules and regulations.  On administrative review, the circuit court reversed the Board's decision, finding it against the manifest weight of the evidence.  The Board appeals, contending that the circuit court erred in reweighing the hearing officer's and the Board's credibility determinations.

On January 7, 1994, the Chicago Police Department Superintendent of Police filed charges with the Board against Ruther, a Chicago Police Detective, alleging that, on November 23, 1993, Ruther solicited a bribe.
(footnote: 1)  Also charged at this time with violations of departmental rules and regulations was Sergeant Chris Zaglifa, one of Ruther's superiors.
(footnote: 2)
Evidence adduced at Ruther's hearing established that, on November 13, 1993, Ruther was assigned to investigate a report of illegal dumping of waste barrels on the west side of Chicago.  His investigation revealed that several of the barrels involved were owned by Javo-Mex Corporation, a manufacturer of detergents and solvents.  On November 15, 1993, Ruther spoke with employees at Javo-Mex and learned how the company disposed of the barrels.  According to two Javo-Mex employees, when the barrels were empty, they were stored on the premises until another company, Jakacki Bag & Barrel (Jakacki), removed those barrels for reconditioning. Determining that the Javo-Mex facility "looked secure," Ruther continued his investigation at Jakacki.  A few days later, Ruther received a call from the owner of Jakacki, who told Ruther that someone named "Mike" also may have received barrels from Javo-Mex.  Ruther documented his investigation in several police reports.

Several days later, on November 23, 1993, at 10 a.m.,  Ruther and Zaglifa went to Javo-Mex.  There, they waited for two hours before speaking with the owner of Javo-Mex, Joseph Cuevas, in Cuevas' office.  It was during this meeting that the bribe demand allegedly occurred.  Although Ruther denied being present for any discussions relating to the bribe, Cuevas testified that Ruther explicitly requested $10,000 to halt the investigation into illegal dumping.

According to Cuevas, while in his office, Zaglifa advised him that he had "serious" problems regarding the dumping of Javo-Mex barrels.  Zaglifa then told Cuevas that, because he was his "friend"
(footnote: 3) he would "squash" the investigation, but it would be expensive.  Zaglifa left the room momentarily, telling Cuevas that Ruther would discuss that matter further.  While Zaglifa was gone, Ruther took out a piece of paper and wrote "$10,000" on it, passing it to Cuevas.  Cuevas then asked what it meant and Ruther responded that "this is what it would cost *** to dispose of the case."  Cuevas attempted to keep the piece of paper, but Ruther took it from him, explaining that he did "not want this to be floating around as evidence."

When Zaglifa returned to the office, Cuevas remarked that "this guy wants $10,000," to which Zaglifa responded, "no shit."  Although expressing surprise, Zaglifa explained the high cost, stating that he had "to take care of a lot of people."  During the meeting, Ruther left the office several times.  Cuevas then told Zaglifa that he needed time to think about it and would call him later.  Zaglifa told Cuevas not to discuss the matter with anyone; he and Ruther then left Cuevas' office.  Sometime later that afternoon, Ruther called Cuevas, but Cuevas told him that he preferred to deal with Zaglifa and would call him later.

Before calling Zaglifa, Cuevas spoke to three long-time employees who advised him to contact Javo-Mex's attorneys.  Those attorneys, in turn, advised Cuevas to contact the Chicago Police Department, which he did shortly thereafter.  As a result of Cuevas' information, an internal investigation was instituted by the police and state's attorney's office.

With Cuevas' permission, Sergeant Steven Jackson of the Chicago Police Department Internal Affairs Division (IAD) listened to telephone conversations between Zaglifa and Cuevas in November 1993.  During a November 29, 1993, telephone call, Cuevas and Zaglifa confirmed a planned November 30, 1993, meeting and Zaglifa told Cuevas that the "numbers" (or bribe amount) "would have to stay the same."  Sergeant Jackson's affidavit, containing information relayed to him by Cuevas and also a synopsis of the content of the telephone calls, was then prepared by the state's attorney's office to obtain an order for a confidential overhear (COH).
(footnote: 4)  

The November 30, 1993, meeting between Zaglifa and Cuevas took place in Cuevas' office and was audio-taped pursuant to the COH order; the content of the tape was admitted at Ruther's hearing.  At that meeting, Cuevas brought $10,000 and gave it Zaglifa.  Zaglifa then explained to Cuevas that he was getting none of the money; rather, 17 or 18 people in the "big wheel" were getting the bribe money.  When Cuevas asked about the whereabouts of "his buddy" (Ruther) and expressed his concern because he did not know Ruther, Zaglifa stated that Ruther was "at a meeting with the Environmental Protection people" and told Cuevas to "trust" him and not "worry" about Ruther.  Zaglifa further stated that he was the man in charge and Cuevas had to trust only him.  Zaglifa then began a lengthy discussion of his desire to return to his previous security job at Javo-Mex.  Zaglifa and Cuevas also briefly discussed "Mike."

After Cuevas' testimony, Ruther testified to a significantly different scenario.  According to Ruther, after he had begun his investigation and had discovered the possible involvement of "Mike" in the dumping, Zaglifa approached Ruther and told him to put his investigation "on hold until he had a chance to look into it."   Ruther made a note of Zaglifa's request and placed it in his investigative file.  The undated, unsigned "note" stated, "I was instructed to put this part of the investigation on hold by Sgt. Big."  

On November 23, 1993, Zaglifa approached Ruther after roll-

call and asked Ruther to accompany him to Javo-Mex that morning.  Although Ruther did not want to go because he was preparing to leave on vacation that evening, he had "no choice."  Ruther testified that he and Zaglifa arrived at Javo-Mex at 10 a.m. and waited until noon to see Cuevas.  The three went to Cuevas' office where they spoke for approximately two hours.  

Ruther denied ever soliciting a bribe or even speaking with Cuevas about money.  Instead, he testified that he left the office five or six times, making phone calls, returning pages, and arranging his travel plans for later that evening.  Ruther further denied calling Cuevas that afternoon.  Ruther acknowledged that he did not document or even mention this meeting in his reports.

Ruther then presented the testimony of three present and two former Chicago Police officers who had known Ruther from one to eleven years; they each described Ruther's truthfulness and integrity.

At the close of the evidence, the hearing officer made her recommendation to the Board.  After the hearing officer "made an oral report of the evidence adduced and the credibility of the witnesses and conferred with the *** Board," the Board found Ruther guilty of violating departmental rules and regulations.  Specifically, the Board found that Ruther violated Rules 1 ("Violation of any law or ordinance"), 2 ("Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit on the Department") and 4 ("Any conduct or action taken to use the official position for personal gain or influence") in that "Ruther solicited a $10,000 bribe."  The Board then "separated and discharged" Ruther from his position as a Detective in the Department.

Ruther filed a complaint for administrative review of the Board's decision.  The circuit court heard argument and reviewed the transcript of the hearing, after which it found that "a review of Mr. Cuevas' testimony raises serious questions of his credibility."  The court further characterized Cuevas' testimony as "evasive, vague, and contradictory."  Noting that the transcript from the audio-tape of the November 30, 1993, meeting between Zaglifa and Cuevas contained only "passing" reference to Ruther, the court found that the tape "raises questions about Mr. Cuevos' (
sic
) prior dealing with [Zaglifa], and these questions further erode the credibility of" Cuevas.  Finding that the totality of the evidence failed to support the conclusion reached by the Board, the court held that "the findings of the Police Board are against the manifest weight of the evidence because an opposite conclusion *** is clearly evident."  The Board appeals the court's order reversing its decision.

Initially, the Board maintains that the circuit court erred because it substituted its judgment of the credibility of witnesses for that of the hearing officer's and Board's.  In response, Ruther asserts the evidence adduced at the hearing did not support the Board's finding and, therefore, that finding was against the manifest weight of the evidence.

The Board is an administrative agency whose findings of fact on review "shall be held to be 
prima
 
facie
 
true and correct."  735 ILCS 5/3-110 (West 1996).  On administrative review, a circuit court inquires only as to whether the findings are against the manifest weight of the evidence; its purpose is not to resolve factual inconsistencies, nor to reweigh the evidence to determine where the preponderance of the evidence lies.  
Launius v. Board of Fire & Police Commissioners
, 151 Ill. 2d 419, 427-28, 603 N.E.2d 477 (1992).  An administrative agency's decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident."  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992).  The fact that a contrary conclusion is reasonable or the court would have ruled differently does not authorize reversal of the agency's decision.  
Abrahamson
, 153 Ill. 2d at 88.  The court must not substitute its judgment for that of the administrative agency; rather, if the record contains evidence to support the agency's findings, its decision should be affirmed.  
Abrahamson
, 153 Ill. 2d at 88.

In the instant case, the hearing testimony consisted primarily of two witnesses--Cuevas and Ruther--who offered two different versions of the events of November 23, 1993.  According to Cuevas, Ruther told him that it would cost $10,000 "to dispose of the case."  Ruther, on the other hand, denied soliciting a bribe on November 23, 1993, but instead maintained that he left the office numerous times and was preoccupied with his upcoming vacation.  He further testified that he never heard Cuevas or Zaglifa discuss a bribe while in the office.  

Although the hearing officer and the Board found Cuevas' testimony credible, the circuit court reversed the Board's finding, discounting Cuevas' testimony as "evasive, vague, and contradictory."  Supporting its finding, the court noted that, during their November 30, 1993, meeting, Zaglifa and Cuevas made only "passing" reference to Ruther.  The court further emphasized Cuevas' "prior dealing" with Zaglifa.  Likewise, the court pointed to Zaglifa's telephone conversation with Cuevas on November 29, 1993, (overheard by Sergeant Jackson) in which Zaglifa "confirmed the amount of the bribe"; the court then found that Zaglifa's confirmation of the bribe "contradicts the Board's contention and Mr. Cuevos' (
sic
) testimony [that] Detective Ruther requested $10,000."  Additionally, the court pointed to the testimony of Sergeant Jackson of the IAD, noting that no phone records were produced to prove that Ruther called Cuevas after allegedly requesting the bribe and that Sergeant Jackson's affidavit did not document that call.

In contradistinction to its negative perception of Cuevas's credibility, the circuit court emphasized Ruther's unblemished career with the Department.  The court further noted that Ruther had documented Zaglifa's request to put his investigation "on hold," supposing that the "only reason [Ruther] stops [his investigation] is because [Zaglifa] tells him to stop, so it seems *** there is no hard evidence produced linking Detective Ruther to the alleged misconduct."

In so finding, however, the circuit court erroneously reweighed the evidence before the Board, making contrary credibility determinations.  Here, despite the court's explicit finding, a conclusion opposite the Board's is 
not
 clearly evident.  On the contrary, the evidence presented at the hearing supports the Board's finding and, therefore, that finding is not against the manifest weight of the evidence.

The circuit court discounted Cuevas' testimony because of his "dealings" with Zaglifa.  Although it could be inferred that Cuevas' prior relationship with Zaglifa might motivate him to somehow protect Zaglifa, it is unclear how these prior dealings would cause Cuevas to falsely accuse Ruther.  In any event, Cuevas clearly implicated 
both
 Zaglifa and Ruther, not just Ruther.

Nevertheless, Ruther suggests that Cuevas falsely implicated him in order to stall the investigation regarding Javo-Mex.  For support, Ruther points to the undisputed fact that Javo-Mex was no longer under investigation and that Sergeant Jackson worked as the new security chief for Javo-Mex.  How these facts, however, give rise to Cuevas' alleged motivation to lie about Ruther's involvement is unclear.  When Cuevas initially identified both Zaglifa (by name) and Ruther (by description) to IAD, he did not know Ruther and there is no evidentiary basis to suggest that Cuevas could have known or expected that by implicating 
two
 police officers, as opposed to just Zaglifa, the investigation into illegal dumping would stop.

Ruther characterizes his own testimony as "the only credible and verifiable evidence," but in so doing ignores the fact that Cuevas' testimony that Ruther asked for $10,000 to halt the investigation was never contradicted by any extrinsic evidence other than Ruther's own testimony.  Although he points to numerous portions of the record where he suggests that Cuevas "had something to hide," "obfuscated" and was "less than forthcoming," the record also reveals that much of Cuevas' defensiveness was due to defense counsel arguing with him; in fact, counsel was admonished numerous times to refrain from arguing with the witness.

At most, the evidence conflicted regarding what occurred in Cuevas' office during the November 23, 1993, meeting.  Cuevas' testimony was not, however, "totally discredited" nor was its acceptance against the manifest weight of the evidence.  See, 
e.g.
, 
Basketfield v. Police Board of Chicago
, 56 Ill. 2d 351, 359, 307 N.E.2d 371 (1974).  Cuevas implicated both Ruther and Zaglifa (his "friend's" son).  Both Ruther and Zaglifa went to Javo-Mex for approximately four hours on November 23, 1993, and met with Cuevas in his office from noon until approximately 2 p.m.  Ruther did not prepare a report of this meeting.  Cuevas immediately spoke to his employees, attorneys and the police after the meeting, implicating both Zaglifa and Ruther.  Seven days later, Cuevas presented Zaglifa with the $10,000.  The circuit court, therefore, erred in finding that the Board's decision was against the manifest weight of the evidence.

Ruther also claims that he was denied due process of law because the hearing officer did not specifically document the 
reason
 why she presumably determined that Cuevas was more credible than Ruther.  Ruther insists that the hearing officer's report and the Board's findings are unreviewable because neither states the basis for their findings.

An administrative proceeding is governed by the principles of due process; however, procedural due process in an administrative hearing does not require a proceeding in the nature of a judicial proceeding.  
Abrahamson
, 153 Ill. 2d at 92.  Administrative proceedings may be conducted by hearing officers who refer the case for final determination to a decision-making board which has not heard the evidence in person.  
Homefinders, Inc. v. City of Evanston
, 65 Ill. 2d 115, 128-29, 357 N.E.2d 785 (1976).  Absent a statute to the contrary, due process is satisfied "if the decision-

making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determinations thereon."  
Homefinders
, 65 Ill. 2d at 128-29.  Due process, however, may require that the hearing officer participate in the Board's decision by submitting a report of her conclusions and impression "if the evidence before a hearing officer or examiner is in such conflict that the weight and credibility to be given the testimony of various witnesses is the determining factor."  
Serio v. Police Board
, 275 Ill. App. 3d 259, 266, 655 N.E.2d 1005 (1995), citing 
American Welding Supply Co. v. Department of Revenue
, 106 Ill. App. 3d 93, 98-99, 435 N.E.2d 761 (1982); see also 
Quincy Country Club v. Human Rights Comm'n
, 147 Ill. App. 3d 497, 500, 498 N.E.2d 316 (1986) ("where credibility is a determining factor in a case, we believe the presiding administrative law judge must participate in the decision").

Ruther acknowledges that the hearing officer "made an oral report of the evidence adduced and the credibility of the witnesses and conferred with the Police Board before it rendered it decision."  Moreover, the record is clear that the Board reviewed all the evidence, including the transcript of proceedings of the hearing.  Nevertheless, he insists that due process was violated because the hearing officer did not provide a written 
justification for her determinations.  He contends that, because neither the hearing officer nor the Board "provided any reviewable facts, statements, impressions, opinions, conclusions, inferences or anything at all to support the credibility determination they obviously made," the circuit court "was precluded from any meaningful analysis of the factual basis for the credibility determination."  We disagree.

Due process was provided where the Board conferred with the hearing officer and reviewed all the evidence and the transcript of proceedings.  Both the hearing officer and the Board provided a written order containing the findings and decision.  This order, coupled with the evidence and transcript of proceedings, was sufficient for review both in the circuit court and in this court.  This record reveals that Ruther received all the process that was due him.  See 
Serio
, 275 Ill. App. 3d at 267.

For the forgoing reasons, we reverse the judgment of the circuit court and reinstate the decision of the Board.

Reversed.

GREIMAN and THEIS, JJ., concur.

FOOTNOTES
1:
At the time of the charges, Ruther had been employed by the  Department since 1971:  the first six years as an officer and the remaining years as a detective.  During those years, Ruther earned two commendations and 25 honorable mentions and never had been disciplined by the Department; further, prior to the bribe allegation, no complaints ever had been lodged against him.

2:
Zaglifa was charged with both soliciting and accepting a bribe.  Prior to his case being heard by the Board, Zaglifa resigned from his position with the Chicago Police Department.

3:
Cuevas had known Zaglifa for several years.  Zaglifa's father was one of Cuevas' friends and Zaglifa had once worked as head of security for Javo-Mex to supplement his police income.  Zaglifa's employment with Javo-Mex had been terminated, however, when the company hired an outside security firm.

4:
Although Sergeant Jackson testified that Cuevas had told him about Ruther's telephone call in the late afternoon on November 23, 1993, his affidavit did not mention that call; Sergeant Jackson described that absence as an "oversight."  Further, no telephone records were admitted corroborating the call.